UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION



**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 17 2009

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

BULLARD FARMS, INC.; MINTURN
FARMS, INC.; DENNIS BULLARD, DAVID
BULLARD, NOEL BULLARD AND JERRY
EADES, AS PARTNERS OF B E & S FARMS
PARTNERSHIP; JASON BULLARD AND
CHRISTOPHER BULLARD, AS PARTNERS
OF J C A FARMS PARTNERSHIP; GLEN
ALLEN; GLEN ALLEN, AS PERSONAL
REPRESENTATIVE OF ESTATE OF JEWEL
ALLEN; ALFRED L. BROCK AND WANDA
J. BROCK, AS PARTNERS OF ALFRED L.
AND WANDA J. BROCK FARMS; DENNIS L.
BROCK AND KAREN BROCK, AS
PARTNERS OF DENNIS L. BROCK
FARMS;; HUNTER BURRIS, D/B/A HUNTER
BURRIS FARMS; WHB FARMS, INC.;
BURRIS FARMS, INC.; RICKY BURRIS AND
BC AND BR FARMS, INC., AS PARTNERS
OF BURRIS FARMS PARTNERSHIP;
REGIONS BANK, AS TRUSTEE FOR
JOSEPH BURNS TRUST, ANN BURNS
SMITH, SLS CORPORATION, JEB
CORPORATION AND JSB CORPORATION,
AS PARTNERS OF CAM PARTNERSHIP;
LSB FARMS LLC, L & E FARMS, LLC, LJB
FARMS LLC AND SLR FARMS LLC, AS
PARTNERS OF BURNS SEED FARMS
PARTNERSHIP; AGMAN, INC.; CALDAL,
INC.; E. PLURIBUS LAND CO., LLC; C. B.
MOERY, JR.,  C.B. MOERY, III AND CARA
KAY COPES, AS PARTNERS OF CANEY
CREEK FARM PARTNERSHIP II; CARLOS
CARTER, INC.; EARL DAUGHTERY
FARMS, INC.; FREDRICK JOE COX;
CYPRESS SLOUGH FARMS, INC.; BOB &
DALE DAVIS FARMS, INC.; BOBBY K.
DAVIS; CHAD DAVIS; DALE DAVIS; DAVIS
CD FARMS, INC.; DAVIS NORTH FARMS,
INC.; DREW DAVIS; DAVIS SOUTH
FARMS, INC.; SHANNON DAVIS; DANNY
DAY, JR.; COPPER INC, CLAY BRADLEY,

CASE No. 3:09CV00132-JMM

This case assigned to District Judge ___Moody___
and to Magistrate Judge___Young___

**JURY TRIAL DEMANDED**

{785619/061145}

INC., INGRAM FAMILY FARM, INC. AND
JEFFERSON COMMUNITY FARM, INC., AS
PARTNERS OF DANNY DAY JR. & SON
PARTNERSHIP; APRIL MORNING
PLANTING COMPANY; S & G FARMS,
INC.; RIDGERUNNER FARMS, INC.;
DAYBREAK FARMS, INC. AND DAYLIGHT
FARMS, INC., AS PARTNERS OF GREGG
DAY PARTNERSHIP; GREGG DAY, PAIGE
DAY, HANNAH FARMS, LLC, AND SHELBY
FARMS, LLC, AS PARTNERS OF G & P
PARTNERSHIP; KIRK FILES, INC.;  J. A.
FILES FARM CO.; JOHN FREEMAN D/B/A
JOHN FREEMAN FARMS; JOHNJACK
FARM, LLC; JBF FARM, INC.; E. FRANK
FREEMAN; OTHNILE BROCKMAN;
YVONNE HENRY; HAROLD GORE AND
JANET GORE, AS PARTNERS OF HAROLD
GORE FARMS; LARRY HOBBS, HOBBS
PLOW, INC. AND HOBBS PLANTING
COMPANY, INC., AS PARTNERS OF HOBBS
FAMILY FARM PARTNERSHIP; ROY
ELLIS; PHYLLIS ELLIS; BILLY RAY
JAMES, DONNA JAMES, JON DAVID
JAMES, BILLY RAY & EDWINA JAMES,
L.L.C.; BILLY JAMES FARMS, INC., JAMES
FARMS, INC., BLACK RIVER FARMS, INC.
AND TRAILS END FARMS, INC., FARMING
AS JAMES FARMS JOINT VENTURE; JOHN
C. KING, JR. AND JOHN C. KING, III, AS
PARTNERS OF KING FARMS; TOMMY
LUCKETT, TONEY LAKE AG, INC. AND
AMY HUDMAN, AS PARTNERS OF D & L
FARMS; KING INVESTMENT; JOHN C.
KING JR. FAMILY LIMITED
PARTNERSHIP; ANN T. KING FAMILY
LIMITED PARTNERSHIP; DEAN LINDLEY
AND MONICA LINDLEY, AS PARTNERS OF
DEAN LINDLEY FARMS; ROGER LITTLE;
WALTER LOCKLEY AG, INC.; CECIL
LOCKLEY AG, INC.; LOCKLEY & SONS,
INC.; WALTER H. LOCKLEY AND
WALTER K. LOCKLEY, AS PARTNERS OF
WALTER W. LOCKLEY & SONS D/B/A
WALTER LOCKLEY PARTNERSHIP;
KEITH MOSBEY, KERRY MOSBEY,
MOSBEY BROTHERS FARMS, INC. AND

{785619 / 061145}                    2

CYPRESS SPRINGS FARMS, INC., AS
PARTNERS OF MOSBEY FARMS
PARTNERSHIP; MOSBEY BROTHERS
FARMS, INC.; CYPRESS SPRINGS FARMS,
INC.; CARROL OWENS, CECIL OWENS
AND CHARLES OWENS, AS PARTNERS OF
OWENS BROTHERS FARM; CARROL
OWENS; CECIL OWENS; CHARLES
OWENS; OSCAR T. OWENS, GEORGE E.
OWENS, JR., MATTHEW T. OWENS,
TANDEM FARMS, INC., WYNARK FARMS,
INC. AND WESTWYN FARMS, INC., AS
PARTNERS OF WESTVIEW FARMS; GREG
SPENCE; MARJO SPENCE, AS TRUSTEE
OF T. O. SPENCE TRUST; CAROLYN
TAYLOR; SHARON SPENCE LANGLEY;
ROBERT PETTER, JR. AND DAVID
PETTER, AS PARTNERS OF PETTER
BROTHERS PARTNERSHIP; PETTER
FARMS, INC.; SADAC, INC.;  VICTORIA H.
CLARK; GARY SEBREE AND PHYLLIS
SEBREE, AS PARTNERS OF FISH LAKE
PLANTING CO.; ANN C. SPARKS;
JOHN E. STEPHEHS, INC.; BOVINE FARM,
INC.; JOHN D. STEPHENS, DAVID H.
STEPHENS AND PRAIRIE DELL FARMS,
INC., AS PARTNERS OF D & S FARMS;
DOROTHY NESS, KAREN MASON,
MARIAN T. RODGERS, HOWARTH E.
TAYLOR, PAUL TAYLOR, GRACE Y.
TAYLOR, DANIEL M. TAYLOR, MARTHA
ENSMIMGER, REBECCA MEGLI, MARY
SANDERS, STEPHEN W. TAYLOR AND
RUTH T. WILLIAMS, FARMING AS W W
TAYLOR FARMS;
WAMPLER ENTERPRISES, INC.; J. A.
WAMPLER, DIANA RIVES AND RICK
RIVES, AS PARTNERS OF W & W FARMS
PARTNERSHIP; JOHN MCGREGOR;
REGIONS BANK, AS TRUSTEE OF R. C.
BRANCH, SR. IRREVOCABLE TRUST;
REGIONS BANK, AS TRUSTEE OF MARY
BRENNEISEN TRUST, WILLIAM KIRSCH
FAMILY TRUST AND WILLIAM KIRSCH
MARITAL TRUST, AS PARTNERS OF S. S.
LIPSCOMB & COMPANY; REGIONS BANK,
AS TRUSTEE OF MARY SUE TAYLOR

{785619 / 061145}                           3

TRUST; REGIONS BANK, AS TRUSTEE OF SHARON K. HARRISON TRUST; REGIONS BANK, AS TRUSTEE OF KOCOUREK GRANDCHILDREN'S TRUST; REGIONS BANK, AS TRUSTEE OF C. H. BRILEY MARITAL TRUST; REGIONS BANK, AS TRUSTEE OF TOM ED SCOTT TESTAMENTARY TRUST; REGIONS BANK, AS TRUSTEE OF ODDIE MAE BLACK TESTAMENTARY TRUST; REGIONS BANK, AS TRUSTEE OF C. B. FINCH, JR. TRUST; REGIONS BANK, AS TRUSTEE OF EARL B. SLOAN, JR. TRUST; REGIONS BANK, AS TRUSTEE OF WILLAGENE MOORE TRUST; REGIONS BANK, AS TRUSTEE OF MARGARET JAYNES TRUST; REGIONS BANK, AS TRUSTEE OF ROY & LINDA SHEPHERD TRUST #1; REGIONS BANK, AS TRUSTEE OF E. C. THOMAS TESTAMENTARY TRUST; REGIONS BANK AS TRUSTEE OF JAMES R. MC FARLIN TESTAMENTARY TRUST; REGIONS BANK, TRUSTEE OF ANNA F. LONG TRUST; BETTY COPELAND; NORMA CARR; WAYNE CARR; DONALD HUCKABAY; KAY HUCKABAY; MAXINE NELSON, AS TRUSTEE OF MAX NELSON REVOCABLE TRUST; BETTY TOONE SEAY; AARON MORRIS; WANDA DICKINSON; G. G. BOYD; CHARLES AINLEY; WYONA AINLEY; B & P FARMS, INC.; TERESA M. SMITH; KAY VANCE, AS TRUSTEE OF VIOLA JEWELL HODGE TRUST; CULVER CREEK FARMS, LLC; FRANK J. SCHREIT, JR.; FRANK JOE SCHREIT, III; ROBERT E. FAHR; HAUCK FARMS, LLC; BRADLEY E. REESE; DONIE HOWE; WILMA HOWE; CHARLES K. TAYLOR; AND JACK TAYLOR,

Plaintiffs,

VS.

{785619 / 061145}

4

BAYER AG,
BAYER CROPSCIENCE AG,
BAYER BIOSCIENCE NV,
BAYER CROPSCIENCE, LP,
BAYER CROPSCIENCE, INC.
BAYER CROPSCIENCE HOLDING, INC.
BAYER CROPSCIENCE LLC,

Defendants.

# COMPLAINT

## I.    INTRODUCTION

1.    These actions have been brought by rice producers from the state of Arkansas. The allegations in this Complaint are based upon the personal knowledge of each of the Plaintiffs named herein (collectively, "Plaintiffs") as to themselves and their own actions, and upon information and belief as to all other matters.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over those actions originally filed in this District pursuant to 28 U.S.C. § 1332.

3.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this District, a substantial part of the property that is the subject of the action is situated, Defendants transact a substantial amount of business in this District, or Defendants otherwise have sufficient contacts with this District to justify them being fairly brought into court in this District.

{785619  061145}                              5

III.    **PARTIES**

A.    **Plaintiffs**

4.    Bullard Farms Inc. is an Arkansas rporation located in Lawrence County, Arkansas. At all times relevant to this actiBullard Farms Inc. was a long-grain rice producer in the State of Arkansas.

5.    Minturn Farms, Inc. is an Arkansas rporation located inLawrence County, Arkansas. At all times relevant to this actioMinturn Farms, Inc. was a long-grain rice producer in the State of Arkansas.

6.    Dennis Bullard, David Bullard, Noel Bullard and Jerry Eades, Arkansas residents, are partners of B E & S Farms rPærship, a partnership basedLiawrence County, Arkansas. At all times relevant to thisaction, they and B E & S Farms rPærship were long-grain rice producers in the State of Arkansas.

7.    Jason Bullard and Christopher Bullard, Arkansesidents, are partners of J C A Farms Partnership, a partnership based in LaereCounty, Arkansas. At all times relevant to this action, they and J C A Farms Partnershure long-grain rice prodercs in the State of Arkansas.

8.    Glen Allen, an Arkansas resident, sides in Little Rock, Pulaski County, Arkansas and owns a portion of land in the EasDistrict of Arkansas. Atll times relevant to this action, long-grain rice was faerd on the land owned by Mr. Allen.

---

[1] All landowners alleged herein were cropshare landlords for their rice land, and therefore are rice producers.

9. Glen Allen is the personal representative of the Estate of Jewel Allen which owns a portion of land in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was farmed on the land owned by the Estate.

10. Alfred L. Brock and Wanda J. Brock, Arkansas residents, are partners of Alfred L. and Wanda J. Brock Farms, a partnership based in Lee County, Arkansas. At all times relevant to this action, they and Alfred L. and Wanda J. Brock Farms, were long-grain rice producers in the State of Arkansas.

11. Dennis L. Brock and Karen Brock, Arkansas residents, are partners of Dennis L. Brock Farms, a partnership based in Lee County, Arkansas. At all times relevant to this action, they and Dennis L. Brock Farms, were long-grain rice producers in the State of Arkansas.

12. Hunter Burris d/b/a Hunter Burris Farms, is an Arkansas resident who resides and farms in Lawrence County, Arkansas. At all times relevant to this action, Mr. Burris and Hunter Burris Farms were long-grain rice producers in the State of Arkansas.

13. WHB, Farms, Inc. is an Arkansas corporation located in Lawrence County, Arkansas. At all times relevant to this action, WHB, Farms, Inc. was a long-grain rice producer in the State of Arkansas.

14. Burris Farms, Inc. is an Arkansas corporation located in Lawrence County, Arkansas. At all times relevant to this action, Burris Farms, Inc. was a long-grain rice producer in the State of Arkansas.

15. Ricky Burris, an Arkansas resident, and BC and BR Farms, Inc., an Arkansas corporation, are partners of Burris Farms Partnership, a partnership based in Lawrence County, Arkansas. At all times relevant to this action, they and Burris Farms Partnership were long-grain rice producers in the State of Arkansas.

16.     Regions Bank, as trustee for Joseph Burns Trust, an Arkansas Trust, Ann Burns Smith, an Arkansas resident, SLS Corporation, JEB Corporation and JSB Corporation, Arkansas corporations, are partners of CAM Partnership, a partnership based in Craighead County, Arkansas. At all times relevant to this action, they and CAM Partnership, were long-grain rice producers in the State of Arkansas.

17.     LSB Farms, LLC, L& E Farms LLC, LJB Farms LJC and SLR Farms LLC, Arkansas limited liability companies, are partners of Burns Seed Farms Partnership, a partnership based in Craighead County, Arkansas. At all times relevant to this action, they and Burns Seed Farms Partnership were long-grain rice producers in the State of Arkansas.

18.     Agman, Inc. is an Arkansas corporation located in Craighead County, Arkansas which owns a portion of the land farmed by CAM Partnership and Burns Seed Farms Partnership. At all relevant times, long-grain rice was farmed on land owned by Agman, Inc.

19.     CALDAL, Inc. is an Arkansas corporation located in Monroe County, Arkansas. At all times relevant to this action, CALDAL, Inc. was a long-grain rice producer in the State of Arkansas.

20.     E. Pluribus Land Co., LLC is an Arkansas limited liability company located in Monroe County, Arkansas. At all times relevant to this action, E. Pluribus Land Co., Inc. was a long-grain rice producer in the State of Arkansas.

21.     C. B. Moery, Jr., C. B. Moery, III and Cara Kay Copes, Arkansas residents, are partners of Caney Creek Farm Partnership II, a partnership based in Cross County, Arkansas. At all times relevant to this action, they and Caney Creek Farm Partnership II were long-grain rice producers in the State of Arkansas.

{785619 / 061145}                                    8

22. Carlos Carter, Inc. is an Arkansas corporation located in Arkansas County, Arkansas. At all times relevant to this action, Carlos Carter, Inc. was a long-grain rice producer in the State of Arkansas.

23. Earl Daughtery Farms, Inc. is an Arkansas corporation located in Arkansas County, Arkansas. At all times relevant to this action, Earl Daughtery Farms, Inc. was a long-grain rice producer in the State of Arkansas.

24. Fredrick Joe Cox is an Arkansas resident who resides in Greene County, Arkansas and farms in Craighead and Greene Counties, Arkansas. At all times relevant to this action, Mr. Cox was a long-grain rice producer in the State of Arkansas.

25. Cypress Slough Farms, Inc. is an Arkansas corporation located in Craighead County, Arkansas. At all times relevant to this action, Cypress Slough Farms, Inc. was a long-grain rice producer in the State of Arkansas.

26. Bob & Dale Davis Farms, Inc. is an Arkansas corporation located in Craighead County, Arkansas. At all times relevant to this action, Bob & Dale Davis Farms, Inc. was a long-grain rice producer in the State of Arkansas.

27. Bobby K. Davis is an Arkansas resident who resides and farms in Craighead County, Arkansas. At all times relevant to this action, Mr. Davis was a long-grain rice producer in the State of Arkansas.

28. Chad Davis is an Arkansas resident who resides and farms in Craighead County, Arkansas. At all times relevant to this action, Mr. Davis was a long-grain rice producer in the State of Arkansas.

29. Dale Davis is an Arkansas resident who resides and farms in Craighead County, Arkansas. At all times relevant to this action, Mr. Davis was a long-grain rice producer in the State of Arkansas.

30. Davis CD Farms, Inc. is an Arkansas corporation located in Craighead County, Arkansas. At all times relevant to this action, Davis North Farms, Inc. was a long-grain rice producer in the State of Arkansas.

31. Davis North Farms, Inc. is an Arkansas corporation located in Craighead County, Arkansas. At all times relevant to this action, Davis North Farms, Inc. was a long-grain rice producer in the State of Arkansas.

32. Drew Davis is an Arkansas resident who resides and farms in Craighead County, Arkansas. At all times relevant to this action, Mr. Davis was a long-grain rice producer in the State of Arkansas.

33. Davis South Farms, Inc. is an Arkansas corporation located in Craighead County, Arkansas. At all times relevant to this action, Davis South Farms, Inc. was a long-grain rice producer in the State of Arkansas.

34. Shannon Davis is an Arkansas resident who resides and farms in Craighead County, Arkansas. At all times relevant to this action, Mr. Davis was a long-grain rice producer in the State of Arkansas.

35. Danny Day, Jr. is an Arkansas resident who resides in Tillar, Arkansas and farms in Desha and Drew Counties, Arkansas. At all times relevant to this action, Mr. Day was a long-grain rice producer in the State of Arkansas.

36. Copper, Inc., Clay Bradley, Inc., Ingram Family Farm, Inc. and Jefferson Community Farm, Inc., Arkansas corporations, are partners of Danny Day Jr. & Son Partnership, a partnership based in Desha and Drew Counties, Arkansas. At all times relevant to this action, they and Danny Day Jr. & Son Partnership were long-grain rice producers in the State of Arkansas.

1785619 061145        10

37.   April Morning Planting Company is an Arkansas corporation located in Desha and Drew Counties, Arkansas. At all times relevant to this action, April Morning Planting Company was a long-grain rice producer in the State of Arkansas.

38.   S & G Farms, Inc, Ridgerunner Farms, Inc., Daybreak Farms, Inc. and Daylight Farms, Inc., Arkansas corporations, are partners of the Gregg Day Partnership, a partnership located in Desha and Drew Counties, Arkansas. At all times relevant to this action, they and Gregg Day Partnership were long-grain rice producers in the State of Arkansas.

39.   Gregg Day and Paige Day, Arkansas residents, and Hannah Farms, LLC and Shelby Farms, LLC, Arkansas corporations, are partners of G & P Partnership, a partnership located in Desha and Drew Counties, Arkansas. At all times relevant to this action, they and G & P Partnership were long-grain rice producers in the State of Arkansas.

40.   Kirk Files, Inc. is an Arkansas corporation located in Monroe County, Arkansas and who owns a portion of land in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by Kirk Files, Inc.

41.   J. A. Files Farm Co. is an Arkansas corporation located in Monroe County, Arkansas and who owns a portion of land in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by J. A. Files Farm Co.

42.   John Freeman is an Arkansas resident residing in and doing business as John Freeman Farms located in Lincoln County, Arkansas. At all times relevant to this action, John Freeman, d/b/a John Freeman Farms, was a long-grain rice producer in the State of Arkansas.

43.   JohnJack Farm LLC, is an Arkansas limited liability company located in Lincoln County, Arkansas. At all times relevant to this action, JohnJack Farm LLC was a long-grain rice producer in the State of Arkansas.

44.     JBF Farm, Inc. is an Arkansas corporation located in Lincoln County, Arkansas. At all times relevant to this action, JBF Farm, Inc. was a long-grain rice producer in the State of Arkansas.

45.     E. Frank Freeman is an individual who resides in Dumas County, Arkansas and who owns a portion of the land farmed by JBF Farm, Inc. At all times relevant to this action, long-grain rice was farmed on land owned by E. Frank Freeman.

46.     Othnile E. Brockman is an individual who resides in Star City, Lincoln County, Arkansas and who owns a portion of the land farmed by JohnJack Farm LLC. At all times relevant to this action, long-grain rice was farmed on land owned by Othnile E. Brockman.

47.     Yvonne Henry is an individual who resides in El Dorado County, Arkansas and who owns a portion of the land farmed by JohnJack Farm LLC. At all times relevant to this action, long-grain rice was farmed on land owned by Yvonne Harry.

48.     Harold Gore and Janet Gore, Arkansas residents, are partners of Harold Gore Farms, and own land in St. Francis County, Arkansas on which long-grain rice was grown at all times relevant to this action.

49.     Larry Hobbs, an individual residing in Colt, Arkansas, Hobbs Plow, Inc., an Arkansas corporation, and Hobbs Planting Company, Inc., an Arkansas corporation are partners of Hobbs Family Farm Partnership, a partnership based in St. Francis County, Arkansas. At all times relevant to this action, they and Hobbs Family Farm Partnership were long-grain rice producers in the State of Arkansas.

50.     Roy Ellis and Phyllis Ellis, are Arkansas citizens who reside in Deer County, Arkansas and who own a portion of the land farmed by the Hobbs Family Farm Partnership. At all times relevant to this action, long-grain rice was farmed on land owned by Roy Ellis and Phyllis Ellis.

{785619 / 061145}                                    12

51.     Billy Ray James, an Arkansas resident, Billy Ray & Edwina James LLC, an Arkansas limited liability company, Donna James and Jon David James, Arkansas residents, and Billy James Farms, Inc., James Farms, Inc., Black River Farms, Inc. and Trails End Farms, Inc., Arkansas corporations at various relevant times, farmed under James Farms Joint Venture based in Lawrence County, Arkansas. At all times relevant to this action, they and the James Farms Joint Venture were long-grain rice producers in the State of Arkansas.

52.     John C. King, Jr. and John C. King, III, Arkansas residents, are partners of King Farms, a partnership based in Phillips County, Arkansas. At all times relevant to this action, they and King Farms were long-grain rice producers in the State of Arkansas.

53.     Tommy Luckett, an Arkansas resident, Toney Lake AG, Inc. an Arkansas corporation, and Amy Hudman, an Arkansas resident, are partners of D & L Farms, a partnership based in Phillips County, Arkansas. At all times relevant to this action, they and D & L Farms were long-grain rice producers in the State of Arkansas.

54.     King Investment Corporation is an Arkansas corporation located in Phillips County, Arkansas which owns a portion of land farmed in Phillips County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by King Investment Corporation.

55.     John C. King Jr. Family Limited Partnership is an Arkansas limited partnership located in Phillips County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by John C. King Jr. Family Limited Partnership.

56.     Ann T. King Family Limited Partnership is an Arkansas limited partnership located in Phillips County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by Ann T. King Family Limited Partnership.

57.     Dean Lindley and Monica Lindley, Arkansas residents, are partners of Dean Lindley Farms, a partnership based in Monroe County, Arkansas. At all times relevant to this action, they and Dean Lindley Farms were long-grain rice producers in the State of Arkansas.

58.     Roger Little is an Arkansas resident who resides and farms in Clay County, Arkansas. At all times relevant to this action, Mr. Little was a long-grain rice producer in the State of Arkansas.

59.     Walter Lockley AG, Inc. is an Arkansas corporation located in Cross County, Arkansas. At all times relevant to this action, Walter Lockley AG, Inc. was a long-grain rice producer in the State of Arkansas.

60.     Cecil Lockley AG, Inc. is an Arkansas corporation located in Cross County, Arkansas. At all times relevant to this action, Cecil Lockley AG, Inc. was a long-grain rice producer in the State of Arkansas.

61.     Lockley & Sons, Inc. is an Arkansas corporation located in Cross County, Arkansas. At all times relevant to this action, Lockley & Sons, Inc. was a long-grain rice producer in the State of Arkansas.

62.     Walter H. Lockley and Walter K. Lockley, Arkansas residents, are partners of Walter W. Lockley & Sons d/b/a Walter Lockley Partnership, a partnership based in Cross County, Arkansas. At all times relevant to this action, they and Walter W. Lockley & Sons d/b/a Walter Lockley Partnership were long-grain rice producers in the State of Arkansas.

63.     Keith Mosbey and Kerry Mosbey, Arkansas residents, and Mosbey Brothers Farms, Inc. and Cypress Springs Farms, Inc., Arkansas corporations, at relevant times were partners of Mosbey Farms Partnership, located in Greene County, Arkansas. At all times relevant to this action, they and Mosbey Farms Partnership were long-grain rice producers in the State of Arkansas.

64.    Mosbey Brothers Farms, Inc. is an Arkansas corporation located in Greene County, Arkansas. At all times relevant to this action, Mosbey Brothers Farms, Inc. was a long-grain rice producer in the State of Arkansas.

65.    Cypress Springs Farms, Inc. is an Arkansas corporation located in Greene County, Arkansas. At all times relevant to this action, Cypress Springs Farms, Inc. was a long-grain rice producer in the State of Arkansas.

66.    Carrol Owens, Cecil Owens and Charles Owens, Arkansas residents, at relevant times were in the partnership, Owens Brothers Farm, a partnership which was based in Cross County, Arkansas. At all times relevant to this action, they and Owens Brothers Farm were long-grain rice producers in the State of Arkansas.

67.    Carrol Owens is an Arkansas resident who resides and farms in Cross County, Arkansas. At all times relevant to this action, Mr. Owens was a long-grain rice producer in the State of Arkansas.

68.    Cecil Owens is an Arkansas resident who resides and farms in Cross County, Arkansas. At all times relevant to this action, Mr. Owens was a long-grain rice producer in the State of Arkansas.

69.    Charles Owens is an individual who resides in Wynne, Cross County, Arkansas and who owns a portion of the land farmed by Carrol Owens, Cecil Owens and Owens Brothers Farm. At all times relevant to this action, long-grain rice was farmed on land owned by Charles Owens.

70.    Oscar T. "Tommy" Owens, George E. "Joey" Owens, Jr. and Matthew T. Owens, Arkansas residents and Tandem Farms, Inc., Wynark Farms, Inc. and Westwyn Farms, Inc., Arkansas corporations, are partners of Westview Farms, a partnership based in Cross County,

Arkansas. At all times relevant to this action, they and Westview Farms were long-grain rice producers in the State of Arkansas.

71. Greg Spence is an individual who resides in Wynne, Cross County, Arkansas and who owns a portion of the land farmed by Westview Farms partnership. At all times relevant to this action, long-grain rice was farmed on land owned by Greg Spence.

72. Marjo Spence is the trustee for the T. O. Spence Trust, an Arkansas trust, that owns a portion of the land farmed by Westview Farms partnership. In this action, Marjo Spence seeks to represent and pursue claims on behalf of the T. O. Spence Trust. At all times relevant to this action, long-grain rice was farmed on land owned by Marjo Spence.

73. Carolyn Taylor is an individual who resides in Wynne, Cross County, Arkansas and who owns a portion of the land farmed by Westview Farms partnership. In this action, she seeks to represent and pursue claims on her own behalf. At all times relevant to this action, long-grain rice was farmed on land owned by Carolyn Taylor.

74. Sharon Spence Langley is an individual who resides in Wynne, Cross County, Arkansas and who owns a portion of the land farmed by Westview Farms partnership. At all times relevant to this action, long-grain rice was farmed on land owned by Sharon Spence Langley.

75. Robert Petter, Jr. and David Petter, Arkansas residents, are partners of Petter Brothers Partnership, a partnership based in Prairie County, Arkansas. At all times relevant to this action, they and Petter Brothers Partnership were long-grain rice producers in the State of Arkansas.

76. Petter Farms, Inc. is an Arkansas corporation located in Prairie County, Arkansas. At all times relevant to this action, Petter Farms, Inc was a long-grain rice producer in the State of Arkansas.

77.   SADAC, Inc. is an Arkansas corporation located in St. Francis County, Arkansas which owns a portion of land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by SADAC, Inc.

78.   Victoria H. Clark, an Arkansas resident, resides in Walnut Ridge, Lawrence County, Arkansas and owns a portion of land farmed in Lawrence County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by Ms. Clark.

79.   Gary Sebree and Phyllis Sebree, Arkansas residents, are partners of Fish Lake Planting Co., a partnership based in Arkansas County, Arkansas. At all times relevant to this action, they and Fish Lake Planting Co. were long-grain rice producers in the State of Arkansas.

80.   Ann C. Sparks resides in Olive Branch, Mississippi and owns a portion of land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by Ms. Sparks.

81.   John E. Stephens, Inc. is an Arkansas corporation located in Arkansas County, Arkansas. At all times relevant to this action, John E. Stephens, Inc. was a long-grain rice producer in the State of Arkansas.

82.   Bovine Farm, Inc. is an Arkansas corporation located in Arkansas County, Arkansas. At all times relevant to this action, Bovine Farm, Inc. was a long-grain rice producer in the State of Arkansas.

83.   John D. Stephens and David H. Stephens, Arkansas residents, and Prairie Dell Farms, Inc., an Arkansas corporation, are partners of D & S Farms, a partnership based in Arkansas County, Arkansas. At all times relevant to this action, they and D & S Farms were long-grain rice producers in the State of Arkansas.

84.   Dorothy Ness, a Florida resident, Karen Mason, a Kentucky resident, Marian T. Rodgers, an Arizona resident, Howarth E. Taylor, an Arkansas resident, Paul Taylor, an Arizona

resident, Grace Y. Taylor, a Texas resident, Daniel M. Taylor, an Illinois resident, Martha Ensmimger. an Arkansas resident, Rebecca Megli, an Oklahoma resident, Mary Sanders, an Arkansas resident, Stephen W. Taylor, a Georgia resident and Ruth T. Williams, an Arkansas resident, farm in Cross County, Arkansas under the name W W Taylor Farms. At all times relevant to this action, they and W W Taylor Farms were long-grain rice producers in the State of Arkansas.

85. Wampler Enterprises, Inc. is an Arkansas corporation located in Woodruff County, Arkansas. At all times relevant to this action, Wampler Enterprises, Inc. was a long-grain rice producer in the State of Arkansas.

86. J. A. Wampler, Diana Rives and Rick Rives, Arkansas residents, are partners of W & W Farms Partnership, a partnership based in Woodruff County, Arkansas. At all times relevant to this action, they and W & W Farms Partnership were long-grain rice producers in the State of Arkansas.

87. John McGregor, is an individual who resides in McCrory, Woodruff County, Arkansas and who owns a portion of the land farmed by W & W Farms Partnership.

88. Regions Bank is the trustee of the R. C. Branch, Sr. Irrevocable Trust which owns a portion of land farmed in Mississippi County, Arkansas. In this action, it seeks to represent and pursue claims on behalf of the R. C. Branch, Sr. Irrevocable Trust. At all times relevant to this action, long-grain rice was farmed on land owned by the Trust.

89. Regions Bank is the trustee of the S. S. Lipscomb & Company, a Tennessee general partnership of the following partners: Mary Brenneisen Trust, William Kirsch Family Trust and William Kirsch Marital Trust. The partnership owns a portion of land farmed in Greene County, Arkansas. In this action, it seeks to represent and pursue claims on behalf of the

trusts comprising the partnership of S. S. Lipscomb & Company. At all times relevant to this action, long-grain rice was farmed on land owned by the Trust.

90.     Regions Bank is the trustee of the Mary Sue Taylor Trust which owns a portion of land farmed in Pope County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Mary Sue Taylor Trust.

91.     Regions Bank is the trustee of the Sharon K. Harrison Trust which owns a portion of land farmed in Prairie County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Sharon K. Harrison Trust.

92.     Regions Bank is the trustee of the Kocourek Grandchildren's Trust which owns a portion of land farmed in Prairie County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Kocourek Grandchildren's Trust.

93.     Regions Bank is the trustee of the C. H. Briley Marital Trust which owns a portion of land farmed in Prairie County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the C. H. Briley Marital Trust.

94.     Regions Bank is the trustee of the Tom Ed Scott Testamentary Trust which owns a portion of land farmed in Lonoke County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Tom Ed Scott Testamentary Trust.

95.     Regions Bank is the trustee of the Oddie Mae Black Testamentary Trust which owns a portion of land farmed in Jackson County, Arkansas. At all times relevant to this action,

long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Oddie Mae Black Testamentary Trust.

96.  Regions Bank is the trustee of the C. B. Finch, Jr. Trust which owns a portion of land farmed in Craighead County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the C. B. Finch, Jr. Trust.

97.  Regions Bank is the trustee of the Earl B. Sloan, Jr. Trust which owns a portion of land farmed in Lawrence County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Earl B. Sloan, Jr.Trust.

98.  Regions Bank is the trustee of the Willagene Moore Trust which owns a portion of land farmed in Craighead County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Willagene MooreTrust.

99.  Regions Bank is the trustee of the Margaret Jaynes Trust which owns a portion of land farmed in Craighead County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Margaret Jaynes Trust.

100.  Regions Bank is the trustee of the Roy & Linda Shepherd Trust #1 which owns a portion of land farmed in Poinsett County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Roy & Linda Shepherd Trust #1.

101.  Regions Bank is the trustee of the E.C. Thomas Testamentary Trust which owns a portion of land farmed in Clay County, Arkansas. At all times relevant to this action, long-grain

rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the E.C. Thomas Testamentary Trust.

102. Regions Bank is the trustee of the James R. McFarlin Testamentary Trust which owns a portion of land farmed in Craighead County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the James R. McFarlin Testamentary Trust.

103. Regions Bank is the trustee of the Anna F. Long Trust which owns a portion of land farmed in Craighead County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, it seeks to represent and pursue claims on behalf of the Anna F. Long Trust.

104. Betty Copeland is an individual who resides in Rector, Clay County, Arkansas and who owns a portion of the land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Ms. Copeland's land.

105. Norma Carr is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Ms. Carr's land.

106. Wayne Carr is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Carr's land.

107. Donald Huckabay is an individual who resides in Rector, Clay County, Arkansas and who owns a portion of the land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Huckabay's land.

{785619 - 061145}                    21

108.   Kay Huckabay is an individual who resides in Rector, Clay County, Arkansas and who owns a portion of the land farmed in the Eastern District of Arkansas.  At all times relevant to this action, long-grain rice was grown on Ms. Huckabay's land.

109.   Maxine Nelson is the trustee of the Max Nelson Revocable Trust, an Arkansas trust which owns a portion of land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust.  In this action, Ms. Nelson seeks to represent and pursue claims on behalf of the Max Nelson Revocable Trust.

110.   Betty Toone Seay is an individual who resides in Little Rock, Pulaski County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Ms. Seay's land.

111.   Aaron Morris is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Morris's land.

112.   Wanda Dickinson is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Ms. Dickinson's land.

113.   G. G. Boyd is an individual who resides in Rector, Clay County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Boyd's land.

114.   Charles Ainley is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Ainley's land.

115. Wyona Ainley is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Ms. Ainley's land.

116. B & P Farms, Inc. is an Arkansas corporation located in Greene County, Arkansas and which owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice producer was produced on B & P Farms, Inc.'s land.

117. Teresa M. Smith is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Ms. Smith's land.

118. Kay Vance, an Arkansas resident, is the trustee of the Viola Jewell Hodge Trust, an Arkansas trust, which owns a portion of land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by the Trust. In this action, Ms. Vance seeks to represent and pursue claims on behalf of the Viola Jewell Hodge Trust.

119. Culver Creek Farms, LLC is an Arkansas limited liability company located in Paragould, Greene County, Arkansas, that owns a portion of land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was on land owned by Culver Creek Farms, LLC.

120. Frank J. Schreit, Jr. is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Schreit's land.

121. Frank Joe Schreit, III is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Schreit's land.

{785619 061145}                                    23

122. Robert E. Fahr is an individual who resides in Paragould, Greene County, Arkansas and who owns a portion of the land farmed in Greene County, Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Fahr's land.

123. Hauck Farms, LLC, is an Arkansas limited liability company, which owns a portion of land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on land owned by Hauck Farms, LLC.

124. Bradley E. Reese is an individual who owns a portion of land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Reese's land.

125. Donie Howe is an individual who owns a portion of land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Howe's land.

126. Wilma Howe is an individual who owns a portion of land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Howe's land.

127. Charles K. Taylor is an individual who owns a portion of land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Taylor's land.

128. Jack Taylor is an individual who owns a portion of land farmed in the Eastern District of Arkansas. At all times relevant to this action, long-grain rice was grown on Mr. Taylor's land.

**B.    Defendants**

129. Bayer AG is a German corporation which, through its subsidiaries and affiliates over which it exerts substantial control, engages in, among other things, the research,

{785619 / 061145}                                    24

manufacture, testing, marketing and sale of agricultural chemicals and technologies, including the genetically-modified rice seeds or rice traits at issue here.

130.    Bayer CropScience AG, a wholly-owned subsidiary of Defendant Bayer AG, is a German corporation which, through its subsidiaries and affiliates over which it exerts substantial control, engages in the research, manufacture, testing, marketing, and sale of agricultural chemicals and technologies, including the genetically-modified rice seeds or rice traits at issue here.

131.    Upon information and belief, Bayer CropScience GmbH merged with and into Bayer CropScience AG. As a result of that merger, Bayer CropScience AG has succeeded to and assumed all debts, commitments, and liabilities of Bayer CropScience GmbH.

132.    Prior to its believed recent merger with Bayer CropScience AG, Bayer CropScience GmbH was a wholly-owned subsidiary of Bayer AG.

133.    Bayer CropScience GmbH contracted with Louisiana State University to test rice containing the genetically-modified rice seed traits at issue here. Bayer CropScience GmbH currently is the registered owner in the United States of the "Liberty Link" trademark for certain agricultural products, including the genetically-modified rice seeds or rice traits at issue here.

134.    Bayer BioScience NV, a wholly-owned subsidiary of Bayer AG, is a Belgian corporation involved in the research, development, and marketing of seeds, including the genetically-modified rice or rice traits at issue here. Founded in 1982 as a spin-off of the University of Ghent, Belgium, Bayer BioScience, NV is one of the main innovation and research centers for Bayer, as defined in Paragraph 41, below. Bayer BioScience NV is the recorded assignee of at least three U.S. patents related to the genetically-modified rice seeds or rice traits at issue here, corresponded with individuals at Louisiana State University, and was the entity to which all unused rice test seed was purportedly returned.

135.    Bayer CropScience LP is a Delaware limited partnership with its principal place of business at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina 27709. Bayer CropScience LP is the successor, by name change, to Aventis CropScience USA, LP – which occurred when Bayer AG acquired Aventis's crop science business in or about October 2001.

136.    Bayer CropScience LP, itself and through its parent, subsidiary, affiliated, and predecessor entities – including all of the defendants listed herein – produces or has produced, *inter alia*, the genetically-modified rice seeds or the seed traits at issue here.

137.    Bayer CropScience LP's general partner is currently Bayer CropScience Holding, Inc., a Delaware corporation with its principal place of business in Research Triangle Park, North Carolina. Prior to its name change, Bayer CropScience LP's general partner was Aventis CropScience USA Holding, Inc. Bayer CropScience LP's limited partners are currently Bayer CropScience, Inc., a New York corporation with its principal place of business in Research Triangle Park, North Carolina, and Bayer CropScience, LLC, a Delaware limited liability company with its principal place of business in Research Triangle Park, North Carolina. Bayer Corporation is the sole owner of Bayer CropScience, LLC.

138.    StarLink Logistics, Inc. ("SLLI"), formerly known as Aventis CropScience USA Holding, Inc., is a Delaware corporation with its principal place of business at One Copley Parkway, Suite 309, Morrisville, North Carolina.

139.    At all times relevant to this action, there has existed, and presently exists, a unity of interest in ownership between Bayer AG, Bayer CropScience AG, Bayer CropScience GmbH, Bayer BioScience NV, Bayer Corporation, and Bayer CropScience LP. These defendants are the alter-egos of one another and, in the case of the parent corporations, exercised decision-making and control over their subsidiaries with respect to the conduct giving rise to Plaintiffs' claims. Alternatively, they have constituted a single business enterprise. In the alternative and without

{785619 / 061145}                                    26

waiving the foregoing, one or more of Bayer CropScience LP, Bayer CropScience Inc., Bayer CropScience Holding, Inc., Bayer CropScience LLC, Bayer BioScience NV, and BCS Holding, SA, are agents of either or both Bayer CropScience AG and Bayer AG and that, in turn, Bayer CropScience AG is an agent of Bayer AG.

140.    Bayer AG, Bayer CropScience AG, Bayer CropScience GmbH, Bayer BioScience NV, Bayer CropScience LP and SLLI are hereinafter collectively referred to as "Bayer" or "Defendants," unless otherwise specified.

## IV.   FACTUAL ALLEGATIONS

### A.    Rice Cultivation in the United States

141.    Rice has been grown in what is now the United States for more than 300 years.

142.    Marketed as a commodity both domestically and abroad, with approximately fifty percent of all U.S.-grown rice sold for export, rice sales generated close to $1.9 billion in revenues for U.S. rice producers during the 2006 crop year. According to the United States Department of Agriculture ("USDA"), the United States is one of the largest exporters of rice in the world, supplying approximately 13 percent of the world's rice trade.

143.    The U.S. rice marketing system is commodity-based, which means that rice grown throughout the U.S. is harvested, gathered, commingled, consolidated, and otherwise shipped from the thousands of farms upon which it is cultivated, through local, regional, and terminal distribution centers. To maintain the stability of the marketing relationship, it is crucial that the U.S. rice supply maintain the highest standards of purity and integrity. Prior to the incidents giving rise to this lawsuit, the U.S. rice market a reputation for purity and integrity.

144.    Because nearly half of the U.S. rice crop is exported annually, *see* Figure 13 (USDA graph), the global rice market has profound impacts on U.S. price levels. The USDA expects that as a result of rising yields and only a modest expansion forecasted in the domestic

market over the next decade, exports will remain critical to the economic viability of the U.S. rice market.



Figure 13

Exports typically account for slightly less than one-half of total use

145.    Mexico, Central America, the Caribbean, the Middle East, sub-Sahara Africa and the European Union ("EU") are the largest markets for U.S. long-grain rice.    *See* Figure 13 (USDA graph).    Prior to the events giving rise to this litigation, the 25-country EU bloc alone imported an average of approximately 20,000 metric tons of long-grain rice from the United States each month.  For example, in 2005, the U.S exported 224,000 metric tons of rice – worth $813 million, of which 198,000 tons was long-grain rice – to the 25-country EU.



Figure 6
Latin America is the largest market for U.S. rice exports

Mil. tons (prod.-weight)

August-July market year

1 Includes Mexico.
Source: U.S. Department of Agriculture, Foreign Agricultural Service, FASonline, Foreign Agricultural Trade of the United States.

146.    In the United States, rice is referred to by length of grain.  Long-grain rice, grown almost exclusively in the South, accounts for nearly seventy-five percent of U.S. rice production and about eighty percent of the U.S.'s total rice exports.  Medium-grain rice, grown both in California and the South, accounts for almost a fourth of the total U.S. rice production and nearly all of California's rice crop.  Short-grain rice is grown mostly in California and accounts for one to two percent of the total U.S. rice crop.

147.    Long-grain rice production in the United States is concentrated in five states: Arkansas, Missouri, Mississippi, Louisiana, and Texas.  Arkansas, with more than fifty percent of U.S. rice acreage, produces more long-grain than any other state.  Louisiana has the second largest area devoted to rice and the second largest long-grain rice production.  Missouri, Mississippi, and Texas rank third, fourth, and fifth, respectively, in both area and production of long-grain rice.

148.    In the 2006 crop year, approximately 2,176,611 acres of long-grain rice were cultivated in the United States, with Arkansas cultivating 1,295,000 acres, Louisiana 331,903

acres, Missouri 214,000 acres, Mississippi 188,159 acres, and Texas 147,549 acres. See Figure 2 (USDA map).



Figure 2
All rice planted acres by county, 2004

U.S. Department of Agriculture, National Agricultural Statistics Service.

149.    More than 34% of the approximately 2,176,611 acres of long-grain rice produced in the United States during the 2006 crop year was planted with Cheniere or BASF's Clearfield 131 ("CL 131"), two types of rice seed found to be contaminated by Bayer with LLRICE as a result of the conduct alleged herein.

B.    Genetically-Modified Seeds and Seed Traits

150.    Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. The genetic composition (or "genome") of a seed can be altered by transferring a transgenic "event" into the seed genome. An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed. The insertion of a specific transgenic event into a seed alters or modifies a seed's genome, conferring a desired characteristic, or "trait," on the crops grown from the seed.

151.    Genetically-modified seed traits are created through laboratory processes whereby genetic material from a foreign species is inserted into the Deoxyribonucleic acid ("DNA") of a traditional plant to effect a desired trait in the future generations of that plant.

152.    In the United States, the first genetically-modified food product (a delayed-ripening tomato) was marketed in 1994. Since their advent and commercial introduction, genetically-modified seeds have been adopted by crop producers at unprecedented rates. During this time, genetically-modified seeds have become available for many crops, including long-grain rice, containing Bayer's regulated or otherwise restricted genetically-modified seed traits – two of which are LLRICE 601 and LLRICE 604 – and the rice seeds or crops containing those traits (collectively "LLRICE," unless otherwise noted), that caused the damages sought in this action.

153.    Although the U.S. government has generally been receptive to using genetically-modified seed traits in food crops, its export partners, including the EU, Mexico, Canada, and Japan, have taken a contrary position, finding that genetic modification has not yet been proven safe and imposing tolerances, restrictions, and prohibitions on genetically-modified crops and foods.

### C.    Bayer's Genetically-Modified "Liberty Link" Rice Traits

154.    Bayer's genetically-modified Liberty Link rice traits – including the LLRICE 601, LLRICE 604, LLRICE 06, and LLRICE 62 rice traits – were developed by AgrEvo, which was acquired by Bayer's predecessor, Aventis CropScience USA, by genetically altering long-grain rice to become resistant to glufosinate, the active ingredient in Liberty® herbicide, another Bayer product.

155.    Aventis – Bayer's predecessor – created its Liberty Link genetically-modified rice traits by inserting a *bar* gene from *Steptomyces hygroscopicus*, a bacterium, under the control of

a 35S promoter sequence derived from cauliflower mosaic virus (35S CaMV) into the genome of commercial rice varieties. The bar gene encodes a phosphinothricin acetyltransferase ("PAT") enzyme that inactivates glufosinate ammonium, the active ingredient in Liberty® herbicide, thus making the genetically-modified organism tolerant to the herbicide. This allows rice growers to spray Liberty" herbicide over a genetically-modified Liberty Link rice field to kill all weeds, but not the rice plants grown from those Liberty Link rice seeds.

156.   LLRICE 601 was first tested in greenhouse and field tests by Hoechst AG, the parent company of AgrEvo USA Company (Aventis's corporate predecessor), in Puerto Rico under USDA permits. Additional field testing of LLRICE 601 was conducted by Aventis in Puerto Rico, Arkansas, Louisiana, Mississippi, and Texas in 1998, 1999, 2000, and 2001. Following its acquisition of Aventis CropScience in or about 2001, Bayer continued to test and develop these genetically-modified rice traits.

157.   As the owner of, and applicant for (either originally or as Aventis's successor), these genetically-modified rice seed traits, Bayer bore responsibility for their development, testing, handling, and use. Bayer's duties were non-delegable.

158.   As genetically-modified products, LLRICE 06, LLRICE 62, LLRICE 601, and LLRICE 604 – and others – were subject to regulatory approval prior to commercialization. In 1999, AgrEvo USA sought and obtained the deregulation of LLRICE 06 and LLRICE 62 for commercial release of those varieties. Neither AgrEvo, nor its successors Aventis or Bayer ever sold those or other genetically-modified rice traits to rice growers.

159.   Prior to the August 2006 disclosure that Bayer had contaminated the U.S. rice supply with its regulated LLRICE 601 genetically-modified rice trait (see infra, neither Bayer nor its predecessors sought deregulation and commercialization of LLRICE 601. Bayer has never sought deregulation of LLRICE 604.

160.    Bayer petitioned the USDA to deregulate LLRICE 601 only after Bayer disclosed that it had contaminated the U.S. rice supply with its LLRICE 601 genetically-modified rice seed trait. On November 24, 2006, the USDA agreed to deregulate LLRICE 601, notwithstanding Bayer's unswerving position that it had (and continues to have) no interest or intention of commercializing LLRICE 601.

161.    Moreover, and as more fully discussed below, the USDA's after-the-fact deregulation of LLRICE 601 does not mitigate the injuries caused to Plaintiffs and Class members or lessen their damages because the U.S.'s rice export partners – including the EU, Russia, and many other countries (*see* chart following Paragraph 88, *infra*) continue to prohibit or otherwise refuse shipments of U.S. rice.

162.    Neither Bayer nor its predecessors have ever sought deregulation of LLRICE 604 – Bayer's genetically-modified rice strain discovered in or about March 2007 to have infiltrated and contaminated BASF's Clearfield 131 ("CL 131") rice. This discovery led to the USDA's ban on the planting of CL 131 in the 2007 crop year and its further prohibition on the sale or use of CL 131 seeds held from the 2005 and 2006 crop years.

163.    In testing, growing, transporting, storing, and disposing of LLRICE, Bayer failed to comply with responsible practices.

164.    Bayer knew that it was virtually impossible as a practical matter to completely isolate LLRICE from other varieties of rice and that rice seeds or crops containing those traits could cross-pollinate with other rice plants.

165.    Furthermore, given the nature of the U.S. grain handling system, Bayer was aware that its genetically-modified rice could easily contaminate the entire U.S. rice crop and infiltrate the general U.S. rice supply unless strict precautionary measures were implemented and followed at all levels from planting through the distribution, transportation, storage, and disposal chain.

**D.    Bayer Knew LLRICE Could Easily Contaminate The U.S. Rice Supply**
**Because Bayer Contaminated the U.S. Corn Supply Only a Few Years Ago**

166.    Bayer's contamination of the U.S. rice supply with LLRICE ñupon which the claims in this action are based—was not the first time that Bayer its corporate predecessor(s) contaminated the supply of a U.S. commodity crop.  In 2000, it was disclosed that Aventis CropScience ñBayer CropScience's corporate predecessor ñhad contaminated the U.S. corn supply with StarLink corn, a corn seed genetically modified to contain a pesticidal protein, which the United States Environmental Protection Agency (EPA) deemed unfit for human consumption.

167.    Violating the terms of the limited registration that the EPA had issued for the use, handling, and commercialization of StarLink corn, Aventis *inter alia*, failed to take the steps mandated to prevent cross-pollination with non-StarLink corn and the contamination of the U.S. corn supply.  As Reuters reported on October 25, 2001, the USDA felt strongly that Aventis had not undertaken enough measures to keep [StarLink] in proper channels.î  When it was disclosed that Aventis's conduct had led to the contamination of the U.S. corn supply, market reaction was swift and severe and U.S. corn producers sustained significant damages resulting therefrom.

168.    Compared with the StarLink situation, Bayer's contamination of the U.S. rice supply with LLRICE is even more suspect and damaging in that, unlike StarLink, those traits were neither deregulated nor approved for commercial use.  Correspondingly in light of the StarLink situation, Bayer was on notice of the dangers of improper testing and handling of unapproved genetically-modified seed traits and the foreseeable ñindeed virtually inevitable ñ effects of supply chain contamination arising therefrom.

169.    On May 22, 2001, the *Houston Chronicle* reported on problems relating to rice containing Bayer's genetically-modified rice traits.  Steve Olafson *Lacking EPA Approval,*

*Millions of Pounds of Biotech Rice Go to Texas Landfill*, Houston Chron., May 22, 2001, at A13. The article reported that Aventis (Bayer's predecessor) had buried five million pounds of rice containing its genetically-modified rice traits to avoid contamination of the U.S. rice supply with its genetically-modified rice traits. *Id.*

170.   In pertinent part, the article stated:

One by one Monday, 18-wheel trucks began hauling away nearly 5 million pounds of genetically modified rice from a Brazoria County farm to a landfill for burial.

The rice, the first to be genetically enhanced, was approved by the US Food and Drug Administration and the United States Department of Agriculture, but approval by the Environmental Protection Agency is pending. Without EPA approval, the rice cannot be served as food, say officials with Aventis CropScience which developed the biotech rice.

The rice could have been marketed for human consumption had it remained in storage bins until the EPA granted approval, but *Aventis wanted to be sure it could properly manage the experimental crop and track its location*, said Peg Cherny, a company spokeswoman.

*Aventis has been criticized for losing track of some of its genetically modified StarLink corn, which reached consumers before it had received government approval.*

*Aventis 'didn't want to create an issue' with its biotech rice*, Cherny said. The rice has been dubbed 'LibertyLink' because it is resistant to Liberty herbicide, a weedkiller commonly used on corn and canola.

\* \* \*

Harvested last August, about 250,000 pounds will be retained for Aventis to use for testing. The rest, about 4.75 million pounds, will be buried.

*Id.* (emphasis added).

171.   Confirming Aventis's (and, correspondingly, Bayer's) knowledge of the effect that contamination of the U.S. rice supply with its unapproved genetically-modified rice traits would have on the U.S. rice market – as well as its potential liability therefor – the Houston

{785619 / 061145}                      35

Chronicle reported, on May 18, 2001, that "Aventis officials have said they dont want to risk the liability that could result if some of th rice should reach markets outside the United States, . . . ." Steve Olafson *Aventis to Bury Almost 5 Million Pounds of Biotech Rice in Texas Landfill*, Houston Chron., May 18, 2001, at A1 (emphasis added).

172.   The Houston Chronicle articles illustrate that Aventis and, correspondingly, its successor, Bayer, were acutely aware of the problems that could arise if Bayer's genetically-modified rice traits were commingled with or otherwise contaminated the U.S. rice supply.

173.   Despite this knowledge – and Defendants' 2001 claim that they "didn't want to create an issue" with their genetically-modified rice – as a result of the wrongful conduct alleged herein, Defendants caused the contamination of the U.S. rice supply – and are directly responsible for the damages arising therefrom – with their unapproved, genetically-modified rice traits – including LLRICE 601 and LLRICE 604.

### E.   Bayer's Contamination of the U.S. Rice Supply With LLRICE 601

174.   On August 18, 2006, U.S. Secretary of Agriculture Mike Johanns (head of the USDA), announced that unapproved genetically-modified rice had been found in supplies destined for human consumption and export.   Specifically, the USDA announced that Bayer CropScience had notified the USDA and the Food and Drug Administration that trace amounts of LLRICE 601 had been detected in samples taken from commercial long-grain rice.

175.   That same day, Riceland Foods ("Riceland"), a producer-owned cooperative based in Stuttgart, Arkansas, issued its own "Statement Regarding Genetically Engineered Material in Rice."   Press Release, Riceland Foods, Statement Regarding Genetically Engineered Material   in   Rice,   (Aug.   18,   2006),   *available   at* http://www.riceland.com/about/ge_docs/Statement%20Regarding%20Material%20in%20Rice% 20Updated.pdf (last visited May 16, 2007).   In that statement, Riceland disclosed that rice

samples from its five-state rice growing region – Arkansas, Louisiana, Mississippi, Missouri and Texas – had tested positive for LLRICE 601. USDA officials later said the LLRICE 601 had been found in bins in Arkansas and Missouri that held rice from the 2005 crop, although the rice in those bins might have come from other states.

176. In its August 18, 2006 statement, Riceland disclosed that the existence of a genetically-modified product in its rice had been discovered in January 2006 by one of its export customers. *Id.* Riceland stated that because genetically-modified rice was not grown commercially in the United States, it initially thought that a small amount of genetically-modified corn or another crop had been mixed in with rice, perhaps through the use of a common means of transportation.

177. In its statement, Riceland also disclosed that, by May 2006, it had found traces of LLRICE 601 contamination in grain storage bins at several sites. Riceland stated that it had advised Bayer of its findings. Bayer then confirmed those findings and found that the LLRICE 601 was present at levels equivalent to six out of every 10,000 grains. Despite this admission, Bayer did not report this contamination to the U.S. government until July 31, 2006.

178. The global markets reacted swiftly and severely to the USDA's August 2006 disclosure of the contamination of the U.S. rice supply with Bayer's unapproved LLRICE 601 genetically-modified seed trait. On or about August 20, 2006, Japan banned the import of long-grain rice from the United States. In addition, on August 23, 2006, the EU announced that it would not accept further shipments of long-grain rice from the U.S. unless the rice is tested and certified to be free of genetically-modified grains. Under the EU's regulations, promulgated as a direct result of the LLRICE 601 contamination, U.S. rice exporters must expressly certify that their rice shipments are free from the contamination by Bayer's genetically-modified rice seed traits.

179. Specifically, the EU issued the following statement:

The European Commission has today adopted a decision requiring imports of long-grain rice from the USA to be certified as free from the unauthorized GMO [genetically-modified organism ("GMO")] LL Rice 601. The decision has been taken in light of the recent announcement by the US authorities that this unauthorized GMO had been found in samples of commercial rice on the US market (see MEX/06/0821). The emergency measures adopted by the Commission today mean that, with immediate effect, only consignments of US long-grain rice that have been tested by an accredited laboratory using a validated testing method and accompanied by a certificate assuring the absence of LL Rice 601, can enter the EU.

Markos Kyprianou, Commissioner for Health and Consumer Protection, said "We have strict legislation in place in the EU to ensure that any GM product put on the European market has undergone a thorough authorization procedure based on scientific assessment. There is no flexibility for unauthorized GMOs - these cannot enter the EU food and feed chain under any circumstances. The measures we have taken today will ensure that unauthorized GM rice is not inadvertently imported. EU consumers can rely on the high level of protection that our GM rules afford them."

Under EU food safety legislation, only GMOs which have undergone a thorough scientific assessment and authorization procedure may be put on the EU market. The decision adopted today therefore aims to prevent the unauthorized LL Rice 601 from reaching EU consumers, by ensuring that only rice certified as free from this GMO enters the EU. The measures will enter into effect immediately, and are expected to be reviewed after 6 months.

Member States['] authorities are responsible for controlling the imports at their borders and for preventing any contaminated consignments from being placed on the market. In addition, they should carry out controls on products already on the market, to ensure that they are free from LL Rice 601. Business operators importing rice from the USA also have responsibility for ensuring that LL Rice 601 does not enter the EU food chain and that imports are certified as free from this unauthorized GMO, in accordance with the EU food law principle that operators are responsible for the safety of the food or feed that they place on the market.

Press Release, European Union, Commission Requires Certification of US Rice Exports to Stop Unauthorized GMO Entering the EU, (Aug. 23, 2006), available at http://europa.eu/rapid/pressReleasesAction.do?reference=IP/06/1120 (last visited May 16, 2007).

180. In trading on the Chicago Board of Trade, the prices of rough rice futures contracts dropped significantly upon news of the contamination and resulting bans or new testing protocols promulgated by the EU, Japan, and other countries. After the news of the LLRICE 601 contamination emerged, the absorption of that negative information into the rice futures market caused those rice futures prices to drop approximately fourteen percent.

181. A trend analysis conducted by the U.S. Rice Producers Association showed that, in response to the USDA's August 18, 2006 disclosure of Bayer's contamination of the U.S. rice supply with LLRICE 601, rice futures prices dropped sharply. U.S. Rice Prodrs. Ass'n, USRPA Updates USDA, Agriculture and Food Industry on Rice Price Trends after LL601, The Rice Advocate, Oct. 20, 2006, at 1, 3. Indeed, according to that organization, the decline in rice futures prices on August 21-22, 2006 alone cost U.S. rice producers approximately $150 million.

182. Correspondingly, on August 22, 2006, the Wall Street Journal reported:

> Trading partners abroad began tightening their controls on American-grown rice after the discovery of an accidental release of a genetically modified variety unapproved for sale by U.S. regulators.
>
> Prices of rice futures contracts sank yesterday as countries such as Japan and South Korea moved to prevent the genetically modified rice from coming into their markets from the U.S., which counts on foreign customers to buy roughly half of its annual production.
>
> \* \* \*
>
> In trading at the Chicago Board of Trade yesterday, the price of the rough rice contract for November delivery dropped 26 cents a hundredweight to settle at $9.84 a hundredweight.

Scott Kilman & Jane Von Reppert-Bismarck, *U.S. Trade Partners Back Off Rice*Wall St. J., Aug. 22, 2006.

183.    Global public awareness of the LLRICE 601 contamination crisis continued to spread.    Despite the EU's ban on contaminated U.S. rice, the genetically-modified rice nevertheless entered the European market.    On September 11, 2006, Reuters reported that LLRICE 601 had found its way into the EU's retail food sector.    A Chief Executive of a German mill suspected to have sold the contaminated rice reportedly stated that this problem was not unique to his mill but, rather, was "a problem affecting every rice mill in Europe which has imported U.S. rice."

184.    On September 14, 2006, Deutsche Welle updated its earlier reports that the European Commission had confirmed that EU imports of long-grain U.S. rice contained traces of LLRICE 601, some of which made it on to shelves of a German supermarket chain.    *German Authorities Confirm GM Rice Findings*Deutsche Welle, Sept. 14, 2006, available at http://www.dw-world.de/dw/article/0,2144,2171602,00.html (last visited May 16, 2007).    All consignments that tested positive were recalled or withheld from the market.    The same article also reported that France and Sweden had found LLRICE 601 in imported U.S. rice.    Discoveries of LLRICE 601 contamination in U.S. rice exported to Europe continue to the present day.

185.    On September 12, 2006, the Associated Press reported that tests by the European Commission on three barges containing rice from the United States had revealed the shipments to contain LLRICE 601.    EU officials stated that consignments found to contain illegal strains either were being destroyed or returned to the United States.

186.    That same day, the Associated Press also reported that the largest supermarket chain in Switzerland had blocked the sale of U.S. long-grain rice after traces of LLRICE 601

were found. The same article reported that the European Commission said on September 12, 2006 that 33 of 162 samples of U.S. rice imports tested by European rice millers contained illegal genetically-altered strains and had been recalled or withheld from the market.

187. Other countries soon followed the lead of the EU and Japan in restricting their import of U.S. rice. For example, in December 2006, Russia halted the importation of U.S. rice. In March 2007, Mexico – the largest importer of U.S. rice – detained shipments of U.S. rice at the border, demanding that the rice be certified to be free of genetically-modified seed. Bayer's contamination of the U.S. rice market with LLRICE 601 has detrimentally affected all of the major U.S. rice export markets and has a negative impact on more than 60% of U.S. rice exports. In addition to the EU, Japan, Korea, and Russia, other nations that have imposed testing requirements or halted the importation of U.S. rice include Canada, the Philippines, Taiwan, and Iraq. *See generally* chart, *infra* (detailing outright bans and restrictions of imports of U.S. rice) (available at http://www.usarice.com/industry/communication/exportimpact.pdf).

## U.S. RICE EXPORT MARKETS IMPACTED BY THE PRESENCE OF LLRICE601

| 2006 Ranking | Country | 2006 Exports (million) | Importer Reaction to Presence of LL601 | Trade Impacted |
|---|---|---|---|---|
| 1 | Mexico | $205 | GM certification required; trade disrupted | X |
| 2 | Japan | $169 | Testing required | X |
| 3 | Iraq | $145 | Testing required; 1% sensitivity | X |
| 4 | Haiti | $112 | Trade continues | |
| 5 | Canada | $107 | Testing @ 0.5% | X |
| 6 | EU | $69 | Trade in LG stopped | X |
| 7 | Saudi Arabia | $42 | Trade continues; labeling for presence >1% | |
| 8 | Nicaragua | $40 | Trade continues | |
| 9 | Cuba | $40 | Trade disrupted; situation uncertain | X |
| 10 | Honduras | $39 | Trade continues | |
| 12 | Korea | $32 | Testing required; tender complications | X |
| 16 | Philippines | $20 | Trade stopped | X |
| 18 | Taiwan | $20 | Testing required | X |
| | Global | $1,289 | Share of global exports impacted 1/ | 63% |

1/ Additionally, Russia has banned all U.S. rice imports, and the UAE importers seeking a "GE free" certificate on U.S. rice.

188.    As a result of these restrictions and prohibitions – which were directly caused by Bayer's conduct alleged herein – as of March 2007, total U.S. grain exports during 2006/2007 were down 476,000 metric tons, or approximately 20 percent, from one year earlier.  David Bennett, *Ban on CL 131 Not Easy Decision*, Delta Farm Press, Mar. 6, 2007, *available at* http://deltafarmpress.com/rice/070306-cl131-ban/ (last visited May 17, 2007).

189.    The vast majority of that drop-off involves long-grain rice – the rice at issue in this litigation – with U.S. long-grain milled rice exports being down 399,000 metric tons, or 35 percent, and U.S. long-grain brown rice exports being down 167,000 metric tons, or 77 percent, from the previous crop year.  David Bennett, *Ban on CL 131 Not Easy Decision*, Delta Farm Press, Mar. 6, 2007, *available at* http://deltafarmpress.com/rice/070306-cl131-ban/ (last visited May 17, 2007).

{7856197 061145}                                    42

190.    Correspondingly, from the time of the August 18, 2006 disclosure of Bayer's contamination of the U.S. rice supply, December wheat futures contracts gained 95 cents per bushel, or up 25 percent; December corn futures contracts gained $1.2575 per bushel, or up 54 percent; and January soybean contracts gained $1.34 per bushel, or up 23 percent.  In contrast, however, January 2007 rice futures contracts − "during one of the greatest grain rallies in history," according to Keith Glover, president and CEO of Producers Rice Mill, the second largest rice co-op in the state of Arkansas − dropped 20 cents per hundredweight, or two percent.

191.    Rather than take steps to address the LLRICE 601 contamination problem by, among other things, (a) removing the contaminated rice from the U.S. rice supply; and (b) restoring global confidence in the purity and integrity of U.S. rice, Bayer concentrated, instead, on pursuing a retroactive deregulation of its LLRICE 601 trait and a finding that it was not harmful in any manner.  Bayer filed its deregulation petition with the USDA on or about August 17, 2006 − one day prior to the public disclosure of Bayer's LLRICE 601 contamination of the U.S. rice supply.

192.    On November 24, 2006, the USDA deregulated LLRICE 601.  The USDA's November 2006 decision to retroactively deregulate LLRICE 601 at Bayer's request, which was rendered notwithstanding Bayer's continued assertion that it did not intend to commercialize rice containing that trait, had no effect on the above-referenced global bans and restrictions on the importation, handling, and use of U.S. rice.  Those bans and restrictions on U.S. rice remain in place around the world.

193.    Bayer's conduct, as alleged herein, has tarnished and devalued the extraordinarily valuable perception in the world markets of the quality and purity of U.S. rice.  This has further diminished the willingness of foreign markets to accept U.S. rice and the price they are willing to

pay for it – and, on information and belief, in some instances resulted in the likely long-term loss of U.S. rice export markets to foreign competitors.

F.    Bayer's Further Contamination of the U.S. Rice
      Seed Supply With LLRICE 601 and LLRICE 604

      1.    Bayer's Contamination of Cheniere Seed with LLRICE 601

194.    The economic disaster visited upon rice producers – including Plaintiffs and the other members of the proposed Classes – by Bayer's contamination of the U.S. rice supply with LLRICE, is not limited to rice harvested for sale.

195.    As a result of Bayer's conduct, two of the most heavily used and highest yielding rice seed varieties in the U.S. – Cheniere and CL 131 – have been contaminated by Bayer's genetically-modified rice seed traits and have thus been banned from planting in, at least, the 2007 crop year. This has led to significant rice seed shortages, increases in the price of rice seed, and has forced rice farmers to plant rice seed varieties with lower yields or less lucrative crops on land previously graded and groomed for rice production. For example, rice producers who have been forced to plant soybeans on land on which they would have planted rice but for Bayer's contamination of the rice seed supply stand to lose several hundred dollars per acre of revenue on the 2007 crop alone.

196.    In September 2006, LLRICE 601 was found in the seed of Cheniere rice, a popular and high-yielding long-grain variety planted throughout the southern United States. In November 2006 – approximately three months after the public disclosure of Bayer's contamination of the U.S. rice supply with LLRICE 601 – the Arkansas State Plant Board unanimously recommended that the State of Arkansas ban the planting of Cheniere rice in 2007. Soon thereafter, on December 28, 2006, the Arkansas State Plant Board passed new regulations that ban the planting of Cheniere rice in the state in 2007 and 2008, and require testing of all seed

for the LLRICE trait at the 0.01% level (i.e., one grain out of every 10,000). This ban – directly caused by Bayer's conduct – left rice producers with the unenviable choice of planting less desirable rice varieties or planting less profitable crops on their land. Similar prohibitions were adopted throughout the rice belt, with substantially similar effects and results.

### 2.    Bayer's Contamination of CL 131 Seed with LLRICE 604

197.    Bayer's contamination of the U.S. rice supply was not limited to that caused by its LLRICE 601 genetically-modified rice trait. In early 2007, it was disclosed that Bayer had further contaminated the U.S. rice seed supply with its LLRICE 604 genetically-modified rice seed trait – a regulated rice trait that was not approved for commercial use or dissemination at any time.

198.    Independent testing by the Arkansas State Plant Board in January 2007 indicated that CL 131 rice seed – a non-genetically-modified rice seed created and marketed by BASF and designed to combat "red rice" weed problems – tested positive for contamination by an unapproved genetically-modified rice seed trait. Bayer's LLRICE 604 genetically-modified seed trait was later disclosed as the source of that contamination.

199.    The non-genetically-modified, herbicide-tolerant rice trait found in CL 131 was created and developed by BASF Ag Products, a Bayer competitor. BASF first registered this trait with the USDA in 2001 and fully released it for production and commercial sale in 2002. CL 131 is designed to resist and control red rice, a weed that poses a substantial threat to U.S. rice producers. By 2006, CL 131 comprised approximately 34% of all rice planted in Louisiana.

200.    Following the Arkansas State Plant Board's CL 131 contamination findings, the Animal and Plant Health Inspection Service of the USDA ("APHIS") conducted its own tests on CL 131 and, in or about early March 2007, confirmed that trace levels of genetically-modified material were present in CL 131 rice seed.

201.    On March 2, 2007 the Arkansas State Plant Board banned the planting of CL 131 rice seed in the state. Shortly thereafter, on March 4, 2007, APHIS issued an Emergency Action Notification ("EAN") with respect to CL 131 rice seed. In its March 5, 2007 press release, APHIS described the then-indefinite hold being placed on the CL 131 rice that Bayer had contaminated with LLRICE:

> [APHIS] is taking action to prevent the planting and distribution of a long-grain rice seed known as Clearfield CL131 because testing by a private company has revealed the possible presence of trace levels of genetic material not yet approved for commercialization.
>
> APHIS began issuing emergency action notifications (EANs) yesterday, March 4, to inform distributors that this seed, scheduled for planting this spring, must be held until APHIS can verify and identify the presence of additional genetic material. APHIS directed distributors to begin notifying producers yesterday. Additional EANs are being issued to affected producers as they are identified.
>
> APHIS is taking this action because the genetic material detected in Clearfield CL131 seed might be regulated, in which case it would not be approved for commercial use. The issuance of EANs will keep any additional CL131 seed from being planted until a determination can be made concerning the identity of this genetic material and the appropriate risk assessment can be conducted. USDA, through its own testing, is in the process of confirming the results reported by BASF Corporation.
>
> This action is prompted by test results informally reported to APHIS by Horizon Ag last Wednesday evening, with written results being provided to APHIS by BASF Corporation and Horizon Ag on Thursday. Clearfield is a registered trademark of BASF. Clearfield CL131 was not developed as a genetically engineered product. Horizon Ag is licensed by BASF Corporation to market this seed. Both companies are fully cooperating with APHIS.

News Release, USDA Animal & Plant Inspection Service, Statement by Dr. Ron DeHaven Regarding APHIS Hold on Clearfield CL131 Long-Grain Rice Seed, (Mar. 5, 2007), *available at* http://www.aphis.usda.gov/newsroom/content/2007/03/ge_riceseed_statement.shtml (last visited May 16, 2007).

202.    Four days later, on March 9, 2007, APHIS issued an update to its prior CL 131 announcement, confirming the presence of unapproved genetically-modified materials therein and prohibiting further distribution or planting of 2005, 2006, or 2007 CL 131 rice seed, stating, *inter alia*:

> Testing by [APHIS] has confirmed the presence of trace levels of genetic material not yet approved for commercialization in Clearfield 131 (CL131) rice seed. ***Based on these test results, further distribution or planting of 2005, 2006, or 2007 registered or certified CL131 seed is prohibited. This seed is not an option for planting this crop season.***
>
> These test results confirm results received from private testing that were announced on Monday, March 5.
>
> ***APHIS is issuing emergency action notifications (EANs) to distributors of 2005, 2006, or 2007 registered or certified CL131 rice seed--and producers who are known to have received it – to stop the further distribution and planting of this seed. And, APHIS is working with the rice industry to inform distributors and farmers with saved CL131 rice seed from prior crop years that they cannot further distribute or plant it.***
>
> ***Producers who have already planted CL131 seed this season prior to this announcement have several options, including treating with an herbicide or mechanically destroying the plants after emergence. A different variety of rice or a broadleaf crop such as soybeans can then be planted in its place.*** For further information about these options, please contact Thomas Sim, Director of Regulatory Operations for APHIS' Biotechnology Regulatory Services program, at (301) 734-7324.
>
> APHIS will provide additional information next week regarding options for any producers or distributors currently holding saved CL131 seed from previous crop years.

News Release, USDA Animal & Plant Inspection Service, Update for Rice Industry Regarding Clearfield 131 Long-Grain Rice Seed, (Mar. 9, 2007), *available at* http://www.aphis.usda.gov/newsroom/content/2007/03/CL131update3-9-07.shtml (last visited May 16, 2007) (emphasis added). APHIS further required that the seed be kept separate from

other rice seed to prevent any mixing, and that it be kept in a secured area marked "DO NOT SELL OR DISTRIBUTE."

203. On March 22, 2007, APHIS announced that the genetically-modified material contaminating the CL 131 seeds was Bayer's LLRICE 604 genetically-modified rice seed trait – a regulated seed trait, of the same lineage as Bayer's LLRICE 601 trait, and not approved for commercial use or dissemination of any kind. News Release, USDA Animal & Plant Inspection Service, USDA Identifies Safe Protein in Clearfield 131 Rice Seed, (Mar. 22, 2007), *available at* http://www.aphis.usda.gov/newsroom/content/2007/03/protein_clearfield131rice.shtml (last visited May 16, 2007).

204. In so concluding, APHIS reiterated its prohibition on the distribution and planting of CL 131, stating, *inter alia*:

> At this time, APHIS has not received a petition from Bayer to deregulate LLRICE604. *Because LLRICE604 remains a regulated article, producers will not be permitted to plant any CL131 seed that is currently on hold. The EANs that have been issued will remain in place for regulatory reasons until APHIS can ensure the untreated rice seed has gone through a process that eliminates the possibility it can be germinated or grown.*

*Id.* (emphasis added).

### 3. The Significant and Continuing Harm Caused by Bayer's Contamination of the U.S. Rice Seed Supply.

205. The disclosure of Bayer's further contamination of the U.S. rice seed supply with another of its mishandled, regulated, and unapproved genetically-modified rice seed traits, threw the U.S. rice market into even greater upheaval and caused continuing and increased market-based and other losses to Plaintiffs.

206. Given that the Cheniere and CL 131 rice seed varieties accounted for a significant percentage of long-grain rice acres planted in the U.S. in the 2006 crop year (as well as in prior

crop years) – the banning of those seed varieties, which was the direct result of Bayer's contamination of the U.S. rice supply with LLRICE has led to severe rice seed shortages in 2007.

207.    This problem was particularly acute in light of the fact that, at the time of the CL 131 seed prohibition, the rice planting season had already begun or was about to begin across the affected area, and rice producers had taken delivery of or already ordered their rice seed for the 2007 crop year – including, but not limited to, the now-banned CL 131 rice seed.

208.    In light of the foregoing, many rice producers were left with the unattractive options of planting other, less profitable crops on their land or, to the extent they were able to find any uncontaminated replacement rice seed at all, planting lower-yielding rice seed varieties that were less suitable for their land or required greater input costs (or obtaining lower yields due to their inability to combat their red rice weed problems with CL 131).  Moreover, given that the supply of rice seed has decreased dramatically, the price of rice seed itself has risen.

G.    **Damages Caused By Bayer's Conduct**

209.    Bayer knew that once its LLRICE infiltrated and contaminated the U.S. rice and rice seed supplies, identification, determination, and segregation of the entire U.S. rice supply would be required in order to prevent rice seeds and crops containing those traits from entering the domestic and international food supply channels; that such a situation would involve material disruptions in the rice trade; impose significant added costs on all participants in the U.S. rice market – costs that will ultimately be borne, or have been borne, by U.S. rice producers; and would detrimentally impact market prices for U.S. rice, causing severe financial damage to U.S. rice producers, including Plaintiffs.

210.    The experiences with StarLink corn by Bayer and its predecessor Aventis placed Bayer on *direct* notice of these specific risks, dangers, and potential consequences.  Bayer knew that if its unapproved, genetically-modified rice seed traits were to escape and contaminate the

U.S. rice supply, the financial and other ramifications, effects, results, and damages arising therefrom – and the manner in which they would generally arise – would be devastating to U.S. rice producers, including Plaintiffs.

211. Despite these facts, Bayer tested its LLRICE without adequate safeguards to prevent their release into the general U.S. rice supply – a course of conduct that led directly to the loss of certain export markets for U.S. rice and the other aforementioned injuries.

212. Bayer failed to adequately instruct, oversee, or control test growers, who were Bayer's agents, to ensure that seeds and crops containing its regulated or otherwise restricted genetically-modified seed traits – including LLRICE 601 or LLRICE 604 – were adequately segregated or contained adequate buffer zones or other protections to prevent the escape of those traits into the U.S. rice supply.

213. Bayer failed to adequately oversee the entire rice testing, production, storage, and distribution chain – from Bayer to distributor to grower to storage facility and beyond – to prevent commingling of LLRICE with the general U.S. rice supply. Bayer's course of conduct caused the contamination of the U.S. rice supply and proximately caused the damages alleged herein.

214. Bayer's conduct also led to the direct introduction of contaminated rice into the U.S. consumer market – where it has never been commercially grown and distributed before.

215. Such wrongful and, at a minimum, reckless conduct by Bayer led directly to the contamination of the U.S. rice and rice seed supplies with Bayer's LLRICE and the market deterioration and other problems arising therefrom that damaged Plaintiffs.

216. Due to the commodity-based structure of the U.S. long-grain rice production and marketing chain and the fungible and interchangeable nature of the rice within that production and marketing chain, physical contamination or damage to any part of the chain is physical

contamination or damage to the entire chain – and all of the long-grain rice therein. Bayer's conduct thus directly led to and proximately caused the infiltration and physical contamination of the U.S. rice supply and rice seed supply with LLRICE. In addition, farmers who planted several seed varieties, including Cheniere and CL 131, unknowingly planted in at least 2005 and 2006 contaminated, genetically-modified rice on the land, and also unknowingly contaminated all their farming equipment, transportation equipment and storage bins that came into contact with their rice seed or harvest rice.

217.    Bayer's conduct thus directly and proximately caused physical harm to the entire U.S. rice supply and rice seed supply, including Plaintiffs' rice and rice seeds.

218.    In addition, Bayer's contamination of the U.S. rice and rice seed supplies has caused physical harm to the real and personal property, including the land, crops, machinery, transportation equipment, and storage bins, of those rice producers who purchased or produced Cheniere and CL 131 seed varieties during the period of time relevant to this action.

219.    As a result of the unapproved presence of LLRICE in the U.S. rice and rice seed supplies, including rice destined for export markets, global confidence in the integrity and purity of the U.S. rice crop has evaporated in those markets, particularly in the EU, Mexico, and Japan, three of the largest importers of U.S. rice. Even U.S. purchasers of rice, who utilize the rice in products shipped abroad, are now concerned about the purity of U.S. rice and may be forced to purchase foreign-grown rice in the future, which would further diminish and damage the U.S. rice market, further injuring U.S. rice producers, including Plaintiffs.

220.    Due to Bayer's wrongful conduct, U.S. rice destined for export markets has been contaminated with LLRICE and has been rejected for the purpose for which it was intended or has been substantially discounted in price, thereby detrimentally impacting the domestic and global rice markets and damaging Plaintiffs.

221.    As a result of Bayer's wrongful conduct, Japan has prohibited all imports of U.S. rice, while the EU and Mexico have prohibited all U.S. rice imports unless they have been scientifically tested and determined not to be contaminated with LL601. Bayer's contamination of the U.S. long-grain rice supply with LLRICE has detrimentally affected the majority of U.S. rice exports.

222.    Furthermore, as a result of Bayer's wrongful conduct, other rice processors and food manufacturers are concerned about the presence of LLRICE in raw products coming into their food manufacturing facilities, thereby further softening the market for U.S. grown rice and further damaging Plaintiffs.

223.    Rice producers who planted or were scheduled to plant CL 131 rice seed in the 2007 crop year – and who are now prohibited from doing so due to the contamination of CL 131 with Bayer's unapproved LLRICE 604 genetically-modified rice seed trait and the concomitant ban on such plantings by APHIS resulting directly therefrom – also sustained the additional damages set forth above.

224.    Bayer's conduct with respect to the events giving rise to the above-described contamination of the U.S. rice supply is particularly egregious, in light of the fact that Bayer (by its predecessor company, Aventis CropScience USA), created the same type of contamination of the U.S. corn market less than seven years ago with its genetically-modified StarLink corn seed product.

225.    Bayer's contamination of the U.S. rice supply with LLRICE has also detrimentally affected the ability of Plaintiffs to move their rice into export channels through storage, handling, processing, and export companies.

226.    In addition, many rice exporters must now undertake expensive and time-consuming testing of all rice crops prior to sale or acceptance into foreign export markets to

{785619 / 061145}                                        52

confirm that they are not contaminated with LLRICE 601 or LLRICE 604 – pursuant to the testing standards imposed by those countries – all of which were known to Bayer prior to the events alleged herein.

227. The economic burden of testing commercial rice crops and segregating rice contaminated with LLRICE from the U.S. rice supply have, and will continue to be, shifted to U.S. rice producers – including Plaintiffs – by diminished bids for long-grain rice brought to market or increased basis points that must be paid by U.S. rice producers.

228. The impact of rice testing imposes an additional burden on rice producers by potentially requiring loads of rice that test positive to be destroyed, barred from export, re-routed to alternative markets, or otherwise subjected to steps, procedures, or restrictions that diminish its value.

229. Furthermore, the cost of segregating non-genetically-modified rice from rice containing Bayer's regulated or otherwise unapproved genetically-modified seed traits – including LLRICE 601 or LLRICE 604 – is significant. As a result of Bayer's wrongful conduct, U.S. rice producers, including Plaintiffs, will be required to take extra steps and incur additional expenses in an effort to preserve the integrity and economic value of their rice crops – including, but not limited to, increased storage costs.

230. U.S. rice producers have also sustained damages to their property as a result of Bayer's wrongful conduct, through the contamination of the entire rice farming and production chain, including, but not limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment.

231. Commodities traders, financial reporters, and agricultural officials have stated that Bayer's above-described contamination of the U.S. rice supply with LLRICE has and will continue to detrimentally impact rice market values and prices, rice futures prices, and U.S. rice

exports.   See, e.g., Jeff Wilson, Rice Falls After Bayer Finds Unapproved Gene in U.S. Stockpiles   Bloomberg.com,   Aug.   21,   2006,   available   at http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aBnXEmRGb2sc   ("Japan suspended U.S. rice imports and the market is discounting prices,' said Bill Nelson, a vice president at A.G. Edwards Inc. in St. Louis. 'Rice is tainted like mad-cow disease . . . .'"; "Before today, rice had risen 49 percent in the past year as world inventories as a percentage of use fell to the lowest since 1982."; "'The market is worried that Europe may ban U.S. rice imports,' Nelson said.") (last visited May 16, 2007); Stephen Clapp, Industry and Advocates File Clashing Comments on LLRICE601, Food Chem. News, Nov. 13, 2006, at 7 ("Perhaps most significant is the continued erosion of international confidence in the wholesomeness of the U.S. food supply occasioned by repeated contamination debacles involving unapproved genetically engineered crops.").

232.    Plaintiffs and the other members of the proposed Classes have been damaged and are at continuing risk of further damages arising out of Bayer's wrongful conduct alleged herein, because of Bayer's contamination of the U.S. rice supply with LLRICE and from the continued detrimental market effects of that contamination on the U.S. futures market and, concomitantly, U.S. long-grain rice prices.

V.    PLAINTIFFS'CLAIMS FOR RELIEF

### Count 1 ‒Common Law Public Nuisance

233.    The Plaintiffs incorporate by reference Paragraphs 1 – 232 J.L. as though fully alleged herein.

234.    Through its conduct alleged above, Bayer has created a public nuisance by causing widespread contamination of the U.S. rice supply and rice seed supplies with LLRICE

(as defined above). This constitutes an unreasonable and substantial interference with rights common to the general public.

235. This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Bayer's testing, growing, storage, transportation, disposal, or otherwise dissemination of LLRICE (a) without adequate precautions to prevent contamination of the U.S. rice and rice seed supplies; (b) with the knowledge that there was a substantial risk that it would contaminate the U.S. rice and rice seed supplies; or (c) with the knowledge that there was a substantial risk it would contaminate U.S. and foreign food supplies.

236. Bayer has unreasonably interfered with the public's right to expect compliance with the federal laws governing the testing, growing, storing, transporting, disposing of and otherwise disseminating LLRICE. Bayer has further unreasonably interfered with the public's right to expect that the rice sold to the general public is free from contamination with LLRICE as well as the public's right to be notified of whether the rice sold to the public is contaminated with genetically-modified organisms – including LLRICE 601 or LLRICE 604 – so that the public has the freedom to choose to purchase and consume non-contaminated long-grain rice.

237. This interference is unreasonable in that it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience. It is also unreasonable in that it is proscribed by federal and state law, is of a continuing nature, and has produced a permanent or long-lasting effect.

238. Plaintiffs have suffered harm caused by Bayer's public nuisance distinct from and different than that suffered by the general public in that, as described above, they have suffered business losses in the form of, among other things, the rejection of their crops by certain markets; reduced or restricted demand for their crops in certain markets; reduced prices for their crops at

market; added costs for segregation, testing, or certification in order to sell their crops; added costs for the decontamination of their property; diminished value of their property; increased costs for rice seed; and inability to find sufficient or suitable rice seed to plant resulting in lower rice crop yields or planting other crops that generate less revenue.

239.    In light of the surrounding circumstances, Bayer knew or should have known that its conduct would naturally or probably result in injuries and damages to the Plaintiffs. Bayer nonetheless continued such conduct in reckless disregard of or conscious indifference to those consequences.

## Count 2 – Common Law Private Nuisance

240.    Plaintiffs incorporate by reference Paragraphs 1 - 239 J.L., as though fully alleged herein.

241.    By its conduct alleged above concerning the testing, growing, storage, transportation, disposal, or otherwise dissemination of LLRICE, Bayer also created a private nuisance.

242.    Plaintiffs have property rights and are privileged in respect to the use and enjoyment of the land on which they produce rice.

243.    Bayer's contamination of the U.S. rice and rice seed supplies has unreasonably interfered with, and will unreasonably interfere with and will substantially impair, Plaintiffs' use and enjoyment of their interests in the land on which they grow or may grow rice.

244.    Bayer's conduct was committed with conscious or reckless disregard of the rights of Plaintiffs, and was grossly negligent and unreasonable. The gravity of the harm far outweighs the utility of Bayer's conduct.

245.    As a direct and proximate result of Bayer's conduct, the Plaintiffs have sustained substantial injuries and damages, including those alleged above.

246. In light of the surrounding circumstances, Bayer knew or should have known that its conduct would naturally or probably result in injuries and damages to the Plaintiffs. Bayer, nonetheless, continued such conduct in reckless disregard of or conscious indifference to those consequences.

### Count 3 – Common Law Absolute Liability – Ultrahazardous Activity

247. Plaintiffs incorporate by reference Paragraphs 1 - 246 J.L. as though fully alleged herein.

248. Bayer's testing, growing, storage, transportation, disposal, or otherwise dissemination of LLRICE constituted and continues to constitute an abnormally dangerous activity or ultrahazardous activity because such activities create a high degree of risk of harm, the harm has been and will be significant, the risk cannot be eliminated by the exercise of reasonable care, the activity is not a matter of common usage, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to Plaintiffs. In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

249. The type of harm suffered by Plaintiffs is the kind of harm the possibility of which makes the activity abnormally dangerous.

250. As a direct and proximate result of Bayer's ultrahazardous or abnormally dangerous activities, Plaintiffs have sustained substantial injuries and damages, including those alleged above.

251. Bayer is thus strictly liable to Plaintiffs for all damages which have resulted or will result from its abnormally dangerous activities with respect to LLRICE.

252. In light of the surrounding circumstances, Bayer knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiffs. Bayer,

nonetheless, continued such conduct in reckless disregard of or conscious indifference to those

consequences.

<u>Count 4 – Common Law Negligence *Per Se* - Violation of the Arkansas Rice
Certification Act, Ark. Code ß 2-15-201 *et seq*</u>

253.   Plaintiffs incorporate by reference Paragraphs 1 - 248, 252 S.L., as though fully alleged

herein.

254.   The Arkansas Rice Certification Act, Ark. Code § 2-15-201 *et seq*., provides in

pertinent part:

> As used in this subchapter:
>
> (1)   "Characteristics of commercial impact" means characteristics that may adversely affect the marketability of rice in the event of commingling with any other rice and includes, but is not limited to, those characteristics:
>
>> (A)   That cannot be identified without the aid of specialized equipment or testing;
>>
>> (B)   That create a significant economic impact in their removal from commingled rice; and
>>
>> (C)   Whose removal from commingled rice is not feasible; and
>
> (2)   "Person" includes any individual, partnership, limited liability company, limited liability partnership, corporation, firm, company, or any other entity doing business in Arkansas.
> Section 2-15-202, Ark. Code
>
> No person may introduce, sell, plant, produce, harvest, transport, store, process, or otherwise handle rice identified as having characteristics of commercial impact, except in compliance with the provisions of this subchapter and the rules adopted by the State Board.
>
> Ark. Code § 2-15-203.

255.   Given that LLRICE had "characteristics of commercial impact," Bayer was

required to comply with the provisions of the above-referenced subchapter and the rules adopted

by the State Board.

256. Bayer's conduct, as alleged above, violated, at a minimum, Ark. Code § 2-15-203 in that Bayer did not comply with provisions in the above-referenced subchapter and the rules adopted by the State Board in at least the following respects:

    (a)    Bayer did not obtain a permit as required by Sections VII (13), (VI) and (VII) of the Regulations on Plant Diseases and Pests; and

    (b)    Bayer did not file documents with the Plant Board declaring ownership of the characteristic of commercial impact as required by Section VII (13), (II)(a) of the Regulations on Plant Diseases and Pests.

257. Bayer had a duty not to violate Ark. Code § 2-15-203

258. The injuries and damages sustained by Plaintiffs, as described above, are the type that Ark. Code § 2-15-203 was designed to prevent, and Plaintiffs are among the class of persons that this law was intended to protect.

259. Bayer breached its duties (as alleged above) and the requisite standard of care, and was thereby negligent.

260. Bayer's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiffs.

261. In light of the surrounding circumstances, Bayer knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiffs. Bayer, nonetheless, continued such conduct in reckless disregard of or conscious indifference to those consequences.

## Count 5 – Common Law Negligence *Per Se* - Violation of the Arkansas Crop & Research Facilities Protection Act, Ark. Code § 2-15-201 *et seq.*

261 J.L.

262. Plaintiffs incorporate by reference Paragraphs I - 257, as though fully alleged herein.

263. Ark. Code § 2-15-101 provides, in pertinent part:

·

(b)(1) Any person or entity who willfully and knowingly damages or destroys any field crop product that is grown for personal or commercial purposes or for testing or research purposes in the context of a product development program in conjunction or coordination with a private research facility or university or any federal, state, or local government agency shall be liable for twice the value of the crop damaged or destroyed.

(2) In awarding damages under this section, the courts shall consider:

(A) The market value of the crop prior to damage or destruction; and

(B) Production, research, testing, replacement, and crop development costs directly related to the crop that has been damaged or destroyed as part of the value of the crop.

264.     Bayer had a duty not to violate Ark. Code § 2-15-101.

265.     The injuries and damages sustained by Plaintiffs, as described above, are the type that Ark. Code § 2-15-101 was designed to prevent, and the Plaintiffs are among the class of persons that this law was intended to protect.

266.     Bayer breached its statutory duty by knowingly damaging Plaintiffs' field crops as alleged above.

267.     Bayer breached its duties (as alleged above) and the requisite standard of care, and was thereby negligent.

268.     Bayer's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiffs.

269.     Plaintiffs are entitled to double damages and reasonable attorneys' fees pursuant to Ark. Code § 2-15-101.

### Count 6 – Common Law Negligence *Per Se* – Violation of the Plant Protection Act and 7 C.F.R. Part 340

269 J.L.

270.     Plaintiffs incorporate by reference Paragraphs 1 – 265, as though fully alleged herein.

271.     Between at least 1998 and 2001, Bayer conducted LLRICE field trials.

272. During the time period relevant to this action, Bayer's LLRICE 601 and LLRICE 604 genetically-modified rice seed traits were (and, in the case of LLRICE 604 and other of Bayer's LLRICE traits, continue to be) "regulated article[s]," as defined by 7 C.F.R. § 340.1:

> Any organism which has been altered or produced through genetic engineering, if the donor organism, recipient organism, or vector or vector agent belongs to any genera or taxa designated in Sec. 340.2 and meets the definition of plant pest, or is an unclassified organism and/or an organism whose classification is unknown, or any product which contains such an organism, or any other organism or product altered or produced through genetic engineering which the Administrator, determines is a plant pest or has reason to believe is a plant pest. Excluded are recipient microorganisms which are not plant pests and which have resulted from the addition of genetic material from a donor organism where the material is well characterized and contains only non-coding regulatory regions

273. Under 7 C.F.R. § 340.0(a)(1) and (2), no person shall "introduce" a "regulated article" except by permit or pursuant to notification and such introduction "is in conformity with all other applicable restrictions in this part." *See also* 7 U.S.C. §7711(a), (c); 7 U.S.C. §7712(a), (c).

274. "Introduce" is defined by 7 C.F.R. § 340.1 as "[t]o move in or through the United States, to release into the environment, to move interstate, or any attempt there at." "Move" is defined as "[t]o ship, offer for shipment, offer for entry, import, receive for transportation, carry, or otherwise transport or move, or allow to be moved into, through or within the United States." *Id.* "Release into the environment" is defined as "[t]he use of a regulated article outside the constraints of physical confinement that are found in a laboratory, contained greenhouse, or a fermenter or other contained structure." *Id.*

275. The "applicable restrictions" for "regulated articles" "introduced" in the United States include the following:

> (1) If the plant or plant materials are shipped, they must be shipped in such a way that the viable plant material is unlikely to be disseminated while in

transit and must be maintained at the destination facility in such a way that there is no release into the environment.

(2)    When the introduction is an environmental release, the regulated article must be planted in such a way that they are not inadvertently mixed with non-regulated plant materials of any species which are not part of the environmental release.

(3)    The plants and plant parts must be maintained in such a way that the identity of all material is known while it is in use, and the plant parts must be contained or devitalized when no longer in use.

(4)    There must be no viable vector agent associated with the regulated article.

(5)    The field trial must be conducted such that:

(i)    The regulated article will not persist in the environment, and
(ii)   No offspring can be produced that could persist in the environment.

(6)    Upon termination of the field test:

(i)    No viable material shall remain which is likely to volunteer in subsequent seasons, or
(ii)   Volunteers shall be managed to prevent persistence in the environment.

7 C.F.R. § 340.3(c).

276.    Bayer had a duty not to violate the Plant Protection Act or the regulations at 7 C.F.R. Part 340.

277.    The injuries and damages sustained by Plaintiffs, as described above, are the type that the Plant Protection Act and 7 C.F.R. Part 340 were designed to prevent, and Plaintiffs are among the class of persons that the Act and the regulations were intended to protect.

278.    Bayer breached its duties under the Plant Protection Act and 7 C.F.R. Part 340 by shipping, planting, maintaining, testing, growing, disposing of, or otherwise disseminating LLRICE in violation of these regulatory standards, including but not limited to introducing LLRICE without a permit or notification and/or also:

{785619 / 061145}                                  62

(1)   Not shipping LLRICE 601 or LLRICE 604 "in such a way that the viable plant is unlikely to be disseminated while in transit";

(2)   Not maintaining LLRICE 601 or LLRICE 604 "at the destination city in such a way that there is no release into the environment";

(3)   Not planting LLRICE 601 or LLRICE 604 "in such a way that they [were] not inadvertently mixed with non-regulated plant materials";

(4)   Not maintaining LLRICE 601 or LLRICE 604 "in such a way that the identity of all material [was] known while in use, and that [the LLRICE was not] contained or devitalized when no longer in use";

(5)   Not conducting its field tests of LLRICE 601 or LLRICE 604 "such that (i) [the LLRICE 601 or LLRICE 604] will not persist in the environment, and (ii) [n]o offspring can be produced that could persist in the environment"; and

(6)   Not terminating the field tests of LLRICE 601 or LLRICE 604 such that "(i) [n]o viable material shall remain with is likely to volunteer in subsequent seasons, or (ii) [v]olunteers shall be managed to prevent persistence in the environment."

279.   Bayer breached its duties (as alleged above) and the requisite standard of care, and was thereby negligent.

280.   As a direct and proximate result of Bayer's breaches, Plaintiffs have sustained substantial injuries and damages, including those alleged above.

281.   In light of the surrounding circumstances, Bayer knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiffs. Bayer, nonetheless, continued such conduct in reckless disregard of or conscious indifference to those consequences.

## Count 7 – Common Law Negligence

282.   Plaintiffs incorporate by reference Paragraphs 1 - 277, as though fully alleged herein.

283. With respect to its testing, growing, storage, transportation, disposal, or otherwise dissemination of LLRICE, Bayer had a duty to utilize its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Bayer's business.

284. As alleged above, Bayer breached this duty by failing to exercise the requisite degree of care in testing, growing, storing, growing, transporting, disposing of, or otherwise disseminating LLRICE to prevent it from contaminating the U.S. rice supply and the U.S. rice seed supply.

285. As further alleged above, Bayer additionally breached this duty by failing to notify the USDA and the public in a timely fashion after it first learned of its contamination of the U.S. rice and rice seed supplies with LLRICE.

286. Bayer breached its duties, as alleged above, breached the requisite standard of care, and was thereby negligent.

287. Bayer's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiffs.

288. In the alternative, with respect to the injuries and damages sustained by Plaintiffs, Bayer's contamination of the U.S. rice and rice seed supplies would not occur in the normal course of events if Bayer had used the highest degree of care while the rice was in its control.

289. Bayer had control of – or the right to control – LLRICE, and was in a superior position to Plaintiffs to know or have means of explaining the course or reason for such occurrence. Bayer is presumed negligent under the doctrine of *res ipsa loquitur.*

290. In light of the surrounding circumstances, Bayer knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiffs. Bayer,

nonetheless, continued such conduct in reckless disregard of or conscious indifference to those consequences.

### Count 8 ʃCommon Law Strict Liability ʃProducts Liability

291.    Plaintiffs incorporate by reference Paragraphs 1- 286, as though fully alleged herein.

292.    Bayer was a supplier of LLRICE and was in the business of manufacturing, assembling, selling, leasing, or otherwise distributing that product.

293.    As alleged above, Bayer supplied LLRICE in a defective condition. LLRICE was unreasonably dangerous when put to a reasonably anticipated use.

294.    LLRICE was used in a manner reasonably anticipated.

295.    Any benefit derived from Bayer's test cultivation of LLRICE is greatly outweighed by the harms resulting from Bayer's contamination of the U.S. rice and rice seed supplies with LLRICE.

296.    As a direct and proximate result of the defective and unreasonably dangerous condition of LLRICE as it existed when Bayer supplied it, Plaintiffs have sustained the injuries and damages alleged above.

297.    In light of the surrounding circumstances, Bayer knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiffs. Bayer, nonetheless, continued such conduct in reckless disregard of conscious indifference to those consequences.

### Count 9 ʃViolation of the North Carolina Unfair and Deceptive Practices Act, N.C. Gen. Stat. ß 75-1.1

298.    Plaintiffs incorporate by reference Paragraphs 1 - 293 as though fully alleged herein.

299.    The North Carolina Unfair and Deceptive Practices Act ("UDTPA"), codified at N.C. Gen. Stat. § 75-1.1 *et seq.*, declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

300.    Bayer's conduct, as alleged above, constitutes violations of the UDTPA.

301.    Bayer, at all times relevant to this litigation, has engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

302.    Bayer's acts and conduct were devised in and emanated from its North Carolina U.S. headquarters. Bayer's North Carolina-based conduct thus directly resulted in the wrongs alleged herein.

303.    As a North Carolina company, Bayer is required not to engage in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. Those acts are unlawful under the provisions of the UDTPA.

304.    A practice is "unfair" under the statute when it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or is substantially injurious to consumers.

305.    Bayer engaged in unfair and deceptive acts or practices in or affecting commerce through, *inter alia*, its negligent, reckless, and willful and wanton conduct that led to the contamination of the U.S. rice supply with its regulated LLRICE seed traits, in violation of federal and state law; and its failure to timely disclose the contamination about which it knew.

306.    By the acts and conduct alleged above, Bayer engaged in unfair and deceptive acts or practices affecting commerce by interfering with normal economic market conditions for rice.

307.    Through the acts and conduct alleged above, Bayer engaged in unfair and deceptive acts or practices in or affecting commerce, in violation of N.C. Gen. Stat. § 75-1.1.

308.   By reason of Bayer's violation of N.C. Gen. Stat. § 75.1-1, Plaintiffs have sustained injuries and damages.

309.   Bayer's violations of N.C. Gen. Stat. § 75.1-1 entitle Plaintiffs to an award of injunctive relief and compensatory damages with interest thereon plus the costs of this action.

310.   Bayer's violations of N.C. Gen. Stat. § 75.1-1 further entitle Plaintiffs to treble damages pursuant to N.C. Gen. Stat. § 75-16.

311.   Bayer's violations of N.C. Gen. Stat. § 75.1-1 further entitle Plaintiffs to reasonable attorneys' fees to be calculated as costs of this action pursuant to N.C. Gen. Stat. § 75-16.1, because Bayer has "willfully engaged in the act or practice" that violates N.C. Gen. Stat. § 75-1.1 and has given its "unwarranted refusal to fully resolve the matter which constitutes the basis of th[is] suit." *Id.* § 75-16 (1).

## VI.    **DEMAND FOR JUDGMENT**

Plaintiffs demand judgment from Defendants for:

(a)    All monetary and compensatory relief to which they are entitled and will be entitled at the time of trial;

(b)    Appropriate injunctive relief restraining Bayer from engaging in further conduct that is substantially likely to lead to additional contamination of the U.S. rice and rice seed supplies and directing Bayer to take affirmative steps to remediate the contamination that it has already caused;

(c)    Punitive damages;

(d)    Treble damages pursuant to N.C. Gen. Stat. § 75-16; or, alternatively, double damages pursuant to Ark. Code § 2-15-101, Miss. Code § 69-49-1;

(e)    Attorneys' fees pursuant to , N.C. Gen. Stat. § 75-16; or, alternatively, attorneys' fees pursuant to, Ark. Code § 2-15-101;

(f)    Prejudgment interest;

(g)    The costs of this action; and

(h)    Such other and further relief as is appropriate.

**Dated:** August 17, 2009

Respectfully submitted,

**GRAY, RITTER & GRAHAM, P.C.**

By: _____

Don M. Downing, Bar # 41786
Gretchen Garrison, Bar # 3189
Jason D. Sapp, Bar # 58511
701 Market Street, Suite 800
St. Louis, Missouri 63101-1826
Tel: (314) 241-5620
Fax: (314) 241-4140
ddowning@grgpc.com
ggarrison @grgpc.com

**LYONS & CONE, P.L.C.**

By: _____

Jim Lyons, Bar # 22083
P.O. Box 7044
Jonesboro, AR 72403
Tel: (870) 972-5440
Fax: (870) 972-1270
jlyons@leclaw.com